703 So.2d 168 (1997)
STATE of Louisiana
v.
Walter GOODWIN, Jr.
No. 96-KA-0334.
Court of Appeal of Louisiana, Fourth Circuit.
November 19, 1997.
Dwight Doskey, New Orleans, for Defendant/Appellant Walter Goodwin, Jr.
Harry F. Connick, District Attorney, Susan Erlanger Talbot, Assistant District Attorney, New Orleans, for Appellee State of Louisiana.
Before BARRY, LOBRANO and MURRAY, JJ.
MURRAY, Judge.
Walter Goodwin, Jr. was charged by grand jury indictment with the first degree murder of Craig Thompson. Mr. Goodwin was convicted by a twelve-person jury of second degree murder, and was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The defendant appeals, asserting that the state's use of grand jury testimony to impeach his alibi witnesses was reversible error, and that there is insufficient evidence to support the verdict. We affirm for the reasons assigned below.
At 1:24 a.m. on Monday, April 11, 1994, the New Orleans Police Department received a report that a gunman had just robbed Russell's Marina Grill on Pontchartrain Boulevard. Two patrol officers arrived at the restaurant ten minutes later to find Elton Hall waving at them frantically from the *169 parking area. Mr. Hall, a dishwasher at the Grill, told the police that after he had emptied some garbage cans in the back, he had reentered the restaurant to see five men, all dressed in black and wearing ski masks, holding guns on the night manager, Craig Thompson. He immediately ran away from the restaurant, returning only when he saw the five robbers leave. He had called Craig's name several times with no response, and had then phones the police.
One of the officers found Mr. Thompson in the restaurant's upstairs office, dead from one gunshot in the back of his head. Two spent .40-caliber casings and two live rounds were found on the scene, and the lock on the upstairs safe had been shot. The policeman returned to his patrol car and called for EMS and the police homicide squad, then informed Mr. Hall that the manager was dead.
Mr. Hall now stated that he had seen only one gunman in the restaurant, standing near the cash register while Mr. Thompson was lying on the floor between two counters. The robber was described as about five feet, nine inches tall with African-American features visible through the holes in the ski mask. Mr. Hall denied hearing any gunshots, but said he thought he had heard the cash register click open as he ran out of the restaurant. He had watched from a distance for a few minutes, then saw the robber run from the back door and meet up with four others dressed all in black. Mr. Hall said that after he saw the five men run towards Robert E. Lee Boulevard, he had returned to the Grill. On further questioning that morning, Mr. Hall added that the perpetrator was about two-hundred pounds with a light or red complexion, but he gave no indication that he could identify the gunman.
Paul "Pavlos" Petrou, the owner of the restaurant, was called to the scene by the police. His examination revealed that five hundred dollars in small bills were missing from the cash register, but the safe upstairs had not been opened. When asked if Mr. Thompson had had any troubles with any of the employees, Mr. Petrou recounted that one of the dishwashers, Kenneth Williams, had been suspended in the preceding week because he got mad and refused to leave when told he was not scheduled to work that day. The officers sent to investigate this lead reported, however, that Mr. Williams had an alibi for the time of the robbery and did not match Elton Hall's description of the gunman. Lacking further information, the investigation was now at a standstill.
On the next afternoon, however, Kenneth Williams recontacted the police and gave a statement implicating Walter Goodwin, Jr., who also worked at the Grill. This led to interviews with two other employees, Isaac Shelby and Charles Caldwell, who corroborated Mr. Williams' claim that Mr. Goodwin had confessed to robbing and killing Mr. Thompson. Mr. Caldwell also said he had seen Walter Goodwin take Mr. Shelby's .40-caliber pistol, the same type used to kill Mr. Thompson, the evening before the murder. After the defendant had been arrested, Elton Hall said he had recognized Mr. Goodwin as the gunman in the restaurant, but at the time he had been too afraid to tell the police.
In pre-trial proceedings, Mr. Hall recanted, then reaffirmed, his identification of Mr. Goodwin as the murderer. At trial, Mr. Shelby testified that he had varied his preliminary testimony because he felt pressured by members of his family. Both Mr. Williams and Mr. Hall admitted at trial that they had lied in their initial statements to police, and Mr. Caldwell testified that until the police told him he was "facing ten to twenty" himself, he had denied any knowledge of the crime or of Mr. Goodwin's confession. It was established at trial that all four of these witnesses had been friends for years, attending the same school and generally hanging out together. They also were acquainted with the defendant before he began working at the Grill, because Walter Goodwin and Isaac Shelby were first cousins, and Mr. Goodwin often visited their grandmother who lived downstairs from Isaac. Additionally, Elton Hall, Kenneth Williams, Isaac Shelby and Charles Caldwell all testified that they had gotten together the morning after the murder, but their testimony regarding whether the robbery had been discussed was inconsistent. Although the gun used in the murder was never found, a spent casing furnished by Mr. Shelby established *170 that it was his pistol that had fired the casings found in the restaurant. Isaac Shelby testified that his three friends, as well as the defendant, knew he had that gun in his bedroom.
It was also established at trial that within a few days of the defendant's arrest, cabdriver David Carpenter had informed the police that his company had received a call at 12:59 a.m. on April 11, asking for a cab at Mr. Goodwin's address. At 1:00 a.m., Mr. Carpenter had picked up a young African-American man who came out from between that address and the house next door, then dropped him off at 1:10 a.m. at a strip shopping center at the intersection of Robert E. Lee and Pontchartrain Boulevards. The man paid Mr. Carpenter twenty-five dollars to return at 2:00 a.m. and pick him up at the same location, in front of the 24-hour grocery. When the cabdriver returned at 1:50 a.m., the same man was just hanging up a pay phone inside the grocery. The man then came outside, got into the cab, and was dropped off at Mr. Goodwin's address ten minutes later.
At his initial police interview, Mr. Carpenter said that the TV news had shown the man that had been arrested for the crime, but that man did not look like his passenger, who was about five feet, seven or eight inches tall, approximately 150 pounds, with dark skin, short hair, and a thin moustache. The fare had worn a black T-shirt with writing on it and was carrying a plastic bag similar to those used by grocery stores, but smaller. When presented with both photographic and physical lineups, Mr. Carpenter eliminated Mr. Goodwin as a possible suspect, but he indicated uncertainty when shown photo arrays that included the four witnesses who had implicated the defendant.
Mr. Carpenter explained that he had been careful to closely examine his passenger, who sat next to him in the front seat, both because he had previously been robbed four times and because the man named no specific destination, but asked only to be taken to the area of Robert E. Lee and Pontchartrain Boulevards. He also stated that he had known the victim, Craig Thompson, and was thus concerned that the perpetrator be caught. Mr. Carpenter testified at trial that the defendant had a much lighter complexion than the man he had transported in his cab the night of the murder.
Walter Goodwin, Jr. took the stand in his own defense, testifying that he arrived home about 9:30 Sunday night and only learned about the murder the next morning. His father, Walter Goodwin, Sr., corroborated this, stating that when he went to bed at 12:15 that Sunday night, Walter was in the kitchen. Both Byron and Carlyn Goodwin, the defendant's brother and sister, testified that they saw their brother in bed at approximately 1:00 a.m., and Carlyn saw him again, still in bed, twenty or twenty-five minutes later when she went to sleep. Both siblings also said that they would have seen or heard anyone leaving the house, so they were certain that Walter was home and in bed at the time of this murder. On cross examination, and without objection from the defense, the prosecutor used grand jury transcripts to show that both Byron and Carlyn Goodwin had previously given testimony that was inconsistent in several details from their assertions at trial.
In this appeal, Mr. Goodwin asserts that this use of grand jury testimony to impeach his witnesses violated the secrecy of grand jury proceedings as provided by Article 434 of the Code of Criminal Procedure. He emphasizes that the credibility of these alibi witnesses was crucial in light of the admitted dishonesty by the four witnesses who linked him to the crime and Mr. Carpenter's testimony that Mr. Goodwin was not the man in the cab. The defendant contends that under these circumstances, the erroneous admission of the prior testimony cannot be viewed as harmless and the verdict must be reversed despite the lack of a contemporaneous objection.
We must agree that the state's use of grand jury testimony to impeach Byron and Carlyn Goodwin was improper under Article 434. See State v. O'Blanc, 346 So.2d 686, 693 (La.1977); State v. Ivy, 307 So.2d 587, 592 (La.1975); State v. Terrebonne, 256 La. 385, 236 So.2d 773 (1970); State v. Bush, 91-0150, p. 3 (La.App. 4th Cir. 3/15/94), 634 So.2d 79, 81. However, in the absence of a contemporaneous *171 objection, our consideration of such an error is prohibited by Code of Criminal Procedure article 841 A, which states that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." Although this rule is not absolute, State v. Arvie, 505 So.2d 44, 47-48 (La.1987), our review of the jurisprudence establishes that exceptions have been made only when a structural or fundamental error has occurred, as in State v. Williamson, 389 So.2d 1328 (La.1980) (erroneous jury instructions).
In the present case, the error at issue is the admission of evidence that should have been excluded, a type of claim routinely barred from appellate review by a failure to object at trial. See, e.g., State v. Grubbs, 93-2559, pp. 7-8 (La.App. 4th Cir. 10/25/94), 644 So.2d 1105, 1111, writ denied, 94-2880 (La. 5/5/95), 654 So.2d 323. Although the basis for exclusion is contained in the Code of Criminal Procedure rather than the Code of Evidence, we find this distinction insufficient to establish that the erroneous admission of the evidence constitutes a fundamental or structural error. The purpose of Article 434's prohibition of the use of grand jury testimony at trial is to encourage the free disclosure of information about crime, not to protect a defendant or witness. O'Blanc, 346 So.2d at 693, and cases cited therein. In the absence of intentional prosecutorial misconduct, we conclude that the state's improper use of such testimony is a trial error requiring a timely objection. Therefore, notwithstanding Mr. Goodwin's reliance upon the credibility of his alibi witnesses, his failure to enter a timely objection at trial precludes our consideration of his claim that the error requires reversal.[1]
Mr. Goodwin next contends that his conviction must be reversed because the evidence presented was insufficient under the standards established in In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) and Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Again emphasizing the questionable credibility of the prosecution witnesses and the lack of any other evidence linking him to this crime, the defendant asserts that no rational trier of fact could have found him guilty beyond a reasonable doubt. Mr. Goodwin argues, as he did at trial, that this murder was committed by one or more of his co-workers, who then conspired to protect the actual perpetrator and to make him the scapegoat.
The standard for appellate review of a claim of insufficient evidence is firmly established in Louisiana law:
An appellate court reviewing a claim of insufficient evidence must determine that the trial evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. The elements must be sufficient that every reasonable hypothesis of innocence is excluded.... If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be upheld. However, if the appellate court finds that no rational trier of fact, viewing all the evidence from a pro-prosecution standpoint, could have found guilt beyond a reasonable doubt, the conviction cannot constitutionally stand.
State v. Hawkins, 96-0766, p. 7 (La.1/14/97), 688 So.2d 473, 479 (citations omitted).
La. R.S. 14:30.1 defines second degree murder as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm; or (2) When the offender is engaged in the perpetration... of ... armed robbery ... even though he has no intent to kill or to inflict great bodily harm." We find that the testimony presented in this case clearly supports a finding that Mr. Goodwin had a specific intent to kill and that he was engaged in the perpetration of an armed robbery.
*172 At trial, Elton Hall testified that after he had emptied the garbage cans on the night of the killing, he reentered the restaurant to hear someone saying "don't look at me." Mr. Hall came closer and saw an African-American male, dressed completely in black and wearing a black ski mask, pointing a gun at Mr. Thompson, who was lying on the floor near the cash register. Mr. Hall heard the victim plead "Walter, please don't kill me," to which the robber replied "don't look at me; don't say my name." At that point, Mr. Hall testified, he realized the gunman was Walter Goodwin, Jr., both by his voice and by the features visible through the ski mask. Additionally, after returning from his unsuccessful attempt to find help, Mr. Hall stated that he suddenly found himself face-to-face with the robber, who pointed his gun and threatened "you tell anyone and I'll kill you like I killed Craig." While Mr. Hall had only worked at the Grill for three days, he testified that he was certain that it was Mr. Goodwin behind the ski mask. Thus, although there was no eyewitness to the actual shooting, the jury was presented with direct evidence that, if believed, establishes that it was the defendant who had robbed Mr. Thompson.
As previously noted, Charles Caldwell testified that he saw Mr. Goodwin take Isaac Shelby's .40-caliber pistol the night before the murder, and both Mr. Shelby and Charles Caldwell testified that the defendant told them he had robbed and killed Mr. Thompson. Although these witnesses, as well as Elton Hall, admitted to telling untruths to the police and in prior sworn testimony, both the details of their inconsistencies as well as their motivations were presented for the jury's consideration and apparently resolved in the state's favor. Unless clearly contrary to the evidence, such a credibility determination may not be reversed by a reviewing court. State v. Guy, 95-0899, p. 7 (La.App. 4th Cir. 1/31/96), 669 So.2d 517, 522, writ denied, 96-0388 (La.9/13/96), 679 So.2d 102. Based upon the record as a whole, we do not find the jury's decision to credit the testimony of these witnesses to be clearly contrary to the evidence.
Mr. Goodwin argues, however, that like the evidence presented in State v. Mussall, 523 So.2d 1305, 1311 (La.1988), the "numerous eccentricities, unusual coincidences and lack of corroboration" in the trial testimony establishes that any rational trier of fact would have had to find a reasonable doubt as to his guilt. This is demonstrated, he contends, by the many questions left unanswered by the state's theory of the case: Knowing there was a gunman in the restaurant, why would Elton Hall return rather than going further to get help? How could Mr. Hall have heard the cash register click open but fail to hear the very loud noise of a .40-caliber gunshot? Since the gunman had just shot and killed Mr. Thompson, why would he allow Elton Hall, who could identify him, walk away from their encounter? Mr. Goodwin asserts that the reasonable answer is that Mr. Hall and/or one of his three good friends committed this crime, then ineptly conspired to implicate him.
In support of this argument, the cabdriver's testimony is characterized as expressing certainty that Mr. Goodwin was not the man brought to the vicinity of the crime that night. However, we find that Mr. Carpenter's testimony was not as decisive as the defendant claims. While he testified that "the man on TV" did not look like his passenger, he admitted that he had had only a brief glimpse of the newscast at issue. It was also shown that Mr. Carpenter believed that one of the photo lineups he was shown had contained three pictures of the same man, and that at the physical lineup he had attempted to identify his passenger by voice rather than by sight. From among all those individuals presented to this cabdriver, either in photos or in person, he had identified seven different people as possibly being the man in his cab. Such evidence could reasonably have led the jury to conclude that, as one of the police investigators testified, Mr. Carpenter "didn't know who was in the car with him."
We further note that Mr. Carpenter's description of the bag carried by his passenger that night was quite similar to the one Mr. Goodwin was said to have used to conceal the gun he took from Mr. Shelby's house earlier that evening. In addition, it was unrefuted *173 that the cab company was given Mr. Goodwin's home address as the pickup location for the passenger, and that Mr. Carpenter's return trip ended at the defendant's house. Absent a link between the cabdriver and those who incriminated Mr. Goodwin, the defense hypothesis of a morning-after conspiracy fails to explain these facts.
As has often been explained, a reviewing court "does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, ... the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt." State v. Whins, 96-0699, p. 4 (La.App. 4th Cir. 4/9/97), 692 So.2d 1350, 1353. Because we find significant evidence that is unexplained by Mr. Goodwin's hypothesis of innocence, we are unable to conclude that no rational juror could have found guilt beyond a reasonable doubt. Therefore, his claim of insufficient evidence must be rejected, and his conviction affirmed.
AFFIRMED.
LOBRANO, J., concurs.
LOBRANO, Judge, concurring.
Respectfully I concur in the affirmation of defendant's conviction and sentence.
NOTES
[1] Similarly, because no objection was made to the state's impeachment of the defendant's girlfriend through the use of improper leading questions, we pretermit discussion of that alleged error.