I,JOAN BERNARD ARMSTRONG, Chief Judge.

STATEMENT OF THE CASE

On July 27, 1988 the defendant was indicted for the first degree murder of Ricky McGonigal. On January 23, 1989, a jury found him guilty as charged, and the next day the jury unanimously recommended he be sentenced to life imprisonment. On February 28, 1989, the court sentenced him to life imprisonment without benefits. He appealed, and this court affirmed his conviction and sentence. State v. Greco, 575 So.2d 407 (La.App. 4 Cir.1991). The Supreme Court denied writs on October 30, 1992. State v. Greco, 605 So.2d 1360 (La.1992).
On October 26, 1995, within the three-year time period in La.C.Cr.P. art. 930.8 as it read at that time, the defendant filed a pro se application for post conviction relief. The defendant filed a second pro se application on November 15, 1995. The defendant retained counsel. On September 15, 1997, the defendant filed another supplemental application. Counsel filed a fourth application on April 6, 1998. The court heard the matter on April 24, 2002, and the hearing was ^continued. On August 26 the State filed procedural objections to the applications, which the court took under advisement. The court held a second hearing on the applications on August 28 and a third hearing on October 30. On February 19, 2003, the court granted the defendant’s application, vacated his conviction and sentence, quashed the indictment against him, and ordered a new trial if the State obtains a new indictment against the defendant. The State noted its objection, and applied for supervisory writs to this court. Pursuant to the order of this court the State has supplemented its application with the trial transcript. The defendant has responded, and the State has replied. The defendant has responded to the reply.

FACTS ELICITED AT TRIAL

In the early morning hours of June 21, 1988, Ricky McGonigal was shot to death on a rural road near Belle Chasse. According to the coroner who conducted the autopsy, Mr. McGonigal sustained two gunshot wounds, one to the head, the other to the upper left chest. In addition, McGonigal had injuries around his eyes, nose, and other parts of his face, which the coroner testified were consistent with the victim having been stomped by a person wearing a tennis shoe. The coroner testified McGonigal’s right arm was in a cast. The coroner stated McGonigal could have survived his injuries if he had received medical treatment. He also stated the bruising around the victim’s face was sustained before death, and the victim had scratches on his back and thighs which were consistent with being dragged through a wooded area. Analysis of the victim’s blood showed a blood-alcohol content of 0.04%. During the autopsy, six handrolled marijuana cigarettes were found in the victim’s sock.
All witnesses to the events leading up to the shooting agree that the victim was with the defendant Joseph Greco, Jr. and Breck Falcon at the time of the 13shooting. Greco and Falcon were part of a group of mostly underage males who had earlier congregated behind a store somewhere on the Westbank, drinking two cases of beer. The males relocated to T.P.’s Bar to shoot pool and play darts. While there, the victim McGonigal approached Falcon in the parking lot. McGonigal indicated he had just received a sizable settlement, was out celebrating, and was tired of taking *1157 cabs to various places. He offered to buy Falcon and anyone else drinks if they would take him to Honey’s Bar. McGonigal initially had a verbal confrontation with Bernell Jackson, another member of the group, and with Greco. At trial, Falcon, William Carr, and Danny Alwell, all members of the group of young men, testified they heard Greco say they should “roll” McGonigal; Bernell Jackson testified Carr told him that “they” were going to “roll” the victim. Kevin Turner, another member of the group, testified Greco declared they should “take” the victim. Greco denied making this statement. Eventually Greco and Falcon agreed to give McGoni-gal a ride to Honey’s in Falcon’s father’s truck.
The three men left, with Greco driving. They stopped to buy more beer for the trip to Honey’s. Because the beer was not very cold, they agreed to drive to Greco’s house to get an ice chest for the beer. Once there, Greco could not locate an ice chest, but he instead retrieved his parents’ gun and placed it inside his pants. He rejoined Falcon and McGonigal in Falcon’s truck, and the men continued to Honey’s. On the way, they decided they needed to answer a call of nature, and they pulled the truck onto a small dirt road. The truck became stuck in mud, and the men eventually freed it, resulting in McGonigal getting muddy.
Falcon insisted that McGonigal ride in the bed of the truck because of his muddy condition. The men got back onto the highway and then soon turned onto Hebert Road. At some point, McGonigal began pounding on the back window, |4and Falcon directed Greco to stop the truck. All three men exited the truck. At this point, the testimony of Falcon and Greco differed greatly. Falcon testified that McGonigal and Greco began arguing. He testified McGonigal stated he was going home, and he began walking back toward the highway. Falcon testified Greco began following McGonigal, continuing to argue with him. Greco then came back to Falcon, raised his shirt, and showed Falcon the gun. He told Falcon he (Greco) was going to have to kill McGonigal. Falcon testified he told Greco to beat McGonigal, not shoot him. Falcon stated Greco then ran back to McGonigal, while Falcon turned away to urinate. He testified he heard Greco and McGonigal arguing, and then he heard Greco yell: “Give me your money.” Falcon testified he heard one gunshot, and as he turned he heard another shot. Falcon stated Greco then came back, got in the truck, and backed it to where McGonigal’s body lay. Falcon insisted he helped Greco place McGonigal’s body into the back of the truck because Greco told him to help him or “pay the consequences.”
Falcon testified they then drove the truck back into a wooded area, where they stopped the truck, got McGonigal out of the flatbed, and dragged him into the woods. Falcon testified Greco turned McGonigal over, took a bank book out of McGonigal’s back pocket, took money, and placed the money in his pocket. Falcon stated that when McGonigal began moaning, Greco stomped him a few times in the head, and then McGonigal grew quiet. Falcon and Greco then left McGonigal’s body and drove back to the main highway, eventually driving to a ear wash where they washed out both the bed and the cab of the truck. They also disposed of McGo-nigal’s shoes and his bank book in a drain at the car wash. They also disposed of the remaining bullets from the gun in another drain. They drove to a friend’s house and borrowed sheets to wipe down the truck and then drove |Bback toward T.P.’s to retrieve Greco’s car. Falcon testified Gre-co told him they would have to meet the next afternoon to dispose of McGonigal’s *1158 body and to retrieve the bullets from his body.
After dropping Greco off at his house, Falcon went home, changed his clothes, and told his father what had happened. Falcon and his father then went to the sheriffs office, where Falcon reported the shooting. Falcon gave a statement and showed deputies the location of McGoni-gál’s body. Falcon admitted he had gotten expelled from school twice, most recently for fighting. He admitted no charges had been filed against him in connection with the shooting. He also admitted that the police did Hot seize his clothes. Although he testified Greco washed his (Greco’s) shoes at the car wash, he could not explain why the shoes were dry soon thereafter when they were seized by the police.
Joseph Greco admitted having three pri- or convictions for simple battery, two for disturbing the peace, one for misdemeanor theft, and two for violations of the laws governing the taking of oysters. He admitted firing the shots which killed McGo-nigal, but his testimony differed greatly from that of Falcon. He denied stating in the parking lot of T.P.’s that he was going to “roll” the victim. He testified he armed himself for protection when he, Falcon, and McGonigal went to his house, and he insisted the other two men could see the gun because its handle was sticking out of his waistband. He testified Falcon and McGonigal discussed drugs during their drive, and he stated he first turned down a small dirt road because Falcon indicated the police seldom patrolled there. He testified that McGonigal and the truck got so covered with mud while freeing the truck that the men drove to a car wash, where he and Falcon washed the truck while McGonigal [(¡rinsed himself and his clothes. He testified McGonigal was upset that Falcon would not let him ride inside the cab of the truck.
Greco testified they then drove onto Hebert Road, and they stopped the truck when McGonigal began pounding on the back window. He stated they all got out of the truck because they had to urinate again. He stated McGonigal was cursing and was upset because they had not taken him where he wanted to go. Greco testified McGonigal then advanced on him, stating: “You ain’t got your friends now, do you?” Falcon was on the other side of the truck, urinating. Greco testified he began backing away from McGonigal, who followed him and swung at him a few times. Greco then pulled the gun, cocked it, and told McGonigal to back off. Greco testified that McGonigal continued coming at him, and as Greco backed away even more, he tripped, and the gun discharged. Greco insisted McGonigal continued coming toward him, and he fired a second time.
Greco insisted it was Falcon’s idea to dump the body. Greco stated Falcon told him the police would not believe the shooting was an accident and that he would spend the rest of Ms life in jail. Greco testified that although Falcon at first wanted to dump McGonigal in the river, instead Falcon decided they should leave McGonigal’s body in the woods. Greco testified that when they loaded McGoni-gal’s body in the back of the truck, McGo-nigal was still moaning. He stated they dragged the victim’s body through the woods, and then Falcon stomped on the victim’s throat to choke him. Greco stated that he walked back to the truck and smoked a cigarette, and when Falcon joined him he had blood on his hands, which he got on the inside of the truck. They then drove the truck to a different car wash, where they cleaned both the cab and the bed of the van, later getting sheets from a friend to dry out the truck. He testified Falcon also disposed of the vie- *1159 tim’s |7property and the remaining shells in the gun. He testified that when he finally arrived at home, he undressed and put his parents’ gun in his shoe. The police soon arrived and arrested him.
Greco admitted giving the police a statement, and although he admitted he signed the one read at trial, he insisted he did not read that statement and that the statement was not what he told the police. He denied telling anyone he was going to kill McGonigal, telling McGonigal to give him his money, or taking any money from McGonigal. He also denied stomping McGonigal. He insisted he did not know that McGonigal had just received a settlement. He stated that after McGonigal cleaned himself at the car wash, he did not want to continue to Honey’s because he was all wet. Instead, he indicated he wanted to be driven to another bar where a relative worked. Greco testified McGo-nigal did not indicate he wanted to go home, nor did he start walking back toward the highway just prior to the shooting. He also denied telling Falcon they would meet the next day to dispose of McGonigal’s body.
Greco’s statement was read to the jury. Most of the statement tracks Greco’s testimony, but in the statement he admits a “blue folder” fell when the victim’s pocket tore as they were lifting his body out of the truck, and he later took money out of the folder at the car wash. In the statement Greco indicated the victim told him that he had a gun and that he (the victim) would use the gun to “blow there [sic] brains out.” In the statement he also admitted he told Falcon they should meet the next afternoon to bury the body.
Rene Coludrovich testified he was the chief of detectives in Plaquemines Parish. He testified that he first reported to the scene of the shooting, and then later questioned the defendant. He testified the defendant was advised of his Miranda | frights, and then Det. Tommy Weaver, who was also present and was in charge of the investigation, read the defendant the contents of a waiver of rights form. Det. Coludrovich stated that the defendant did not appear intoxicated to him when he gave his statement. Det. Coludrovich testified Det. Weaver questioned the defendant, while he typed the statement. He admitted the statement was not a verbatim account of what the defendant said, but instead unspecified parts of the statement were paraphrased. He testified he did not tape the defendant’s statement; rather, he typed the statement because it was his practice to type suspects’ statements. However, he admitted that Falcon’s statement was taped, not typed, and at the time Falcon gave his statement (apparently his June 21 statement) Falcon was also a suspect. Det. Coludrovich testified the defendant signed all four pages of the statement. He testified the defendant appeared to read the statement prior to signing it, and he denied trying to hurry the defendant in reading and signing the statement. Det. Coludrovich admitted that while his signature appeared on pages one, two, and four of the statement, only his initials appeared on page three. He denied, however, that these initials were placed there using a different pen at a different time. He testified Det. Weaver did not leave the room during the taking of the statement.
Det. Coludrovich admitted that the statement he typed did not contain information which he put into a supplemental report. He stated that after taking the defendant’s statement, he conferred with Det. Weaver later that night and discovered he had omitted the defendant’s statement that Falcon’s only participation in the shooting was helping the defendant move the victim’s body into the truck and *1160 then out of the truck at the place where the body was dumped. He also omitted the defendant’s statement that Falcon did not receive any of the |9money the defendant had taken from the victim. He admitted these statements he placed in the supplemental report were paraphrased from what the defendant told them.
Det. Tommy Weaver testified that after receiving the call about the shooting, he went to the scene on the possibility that the victim might still be alive. When he arrived, Falcon and his father were also on the scene, and Falcon led them to the place where he and the defendant had dumped the victim’s body. He testified he called for the coroner, an ambulance, and a crime scene technician, and then he and the Falcons went back to the Belle Chasse Lockup. He testified that he then interviewed Falcon, but this interview was neither taped nor typed. At this time Falcon was not under arrest. After this interview, he had someone arrest the defendant and transport him to the lockup. He testified he spoke again with Falcon, and when the defendant appeared at the lockup he briefly interviewed him. He did not type or tape this interview. Det. Weaver testified he obtained permission from the defendant’s father to seize certain items from the father’s house (where the defendant lived), and both the defendant and his father signed a consent to search form. He testified the residence was searched, photographs were taken, and certain items were seized.
Det. Weaver testified Det. Coludrovich decided they would type the defendant’s statement instead of taping it. He stated that the defendant did not appear intoxicated when he gave the statement, and he was coherent. Det. Weaver testified the defendant first gave a narrative of the shooting, and then Det. Weaver asked the defendant questions while Det. Coludro-vich typed the statement. He admitted the typed statement was a paraphrase of what was said in the statement, and he further admitted it did not contain important information concerning [inFalcon’s participation in the shooting. When describing this omitted information, Det. Weaver testified he told the defendant that Falcon had told him the defendant had killed and robbed the victim, and Det. Weaver asked the defendant what part Falcon had played in the shooting. Det. Weaver testified the defendant responded that Falcon had merely helped him load and unload the victim from the truck. Det. Weaver testified he then asked the defendant if Falcon had gotten any of the victim’s money, and he testified the defendant said Falcon had not, but the defendant had taken approximately $60 from the victim. Det. Weaver testified that when reviewing the defendant’s statement later that night, he noticed this information was missing and called Det. Coludro-vich to point out the omission. Det. Colu-drovich then put this information in a supplemental report.
Det. Weaver testified the police seized the sheets used to wipe down the truck and the victim’s shirt from a drain located behind the defendant’s house, and the two empty shells were seized from a drain “up from” the car wash. He also testified they conducted paraffin tests on both the defendant’s and Falcon’s hands. He testified Falcon was arrested for accessory after the fact to first degree murder, but the officers did not seize his clothes because all indications were that Falcon merely helped move the victim’s body. Det. Weaver testified he did not meet with anyone from the district attorney’s office or with any investigators from the district attorney’s office until July 4, a few weeks after the shooting.
*1161 N.O.P.D. Officer Timothy Seuzeneau was qualified as an expert in the comparison of fingerprints. He testified the gun seized from the defendant’s house was negative for identifiable prints, and he testified this was not unusual because guns generally have oil on their surfaces. He testified two prints were lifted from a Budweiser can found at the scene of the shooting, and while one print was |T unsuitable for comparison, the other matched Falcon’s fingerprints. He testified no prints were found on a Milwaukee’s Best can also found at the scene. He testified he was not given any currency to test.
Deputy Wayne Sieffert, was recalled by the defense. During this examination, he testified he tested exhibit S 13 for fingerprints. Exhibit S 13 is listed in the minute entry of trial as six $20 bills, one $5 bill, and two $1 bills. Although he did not explicitly state that he found no prints, he testified he did not send the currency to either the N.O.P.D. or the Jefferson Parish crime labs for comparison.

POST-CONVICTION HEARINGS

At the April 24, 2002 hearing, the State urged that the trial court summarily rule on the merits of the application without holding heaidngs, mostly based on the intention of a judge who had earlier considered the matter but who no longer had the case. The court refused to do so. The defense elicited testimony from Ms. Mary Buras, of the registrar of voters office in Plaquemines Parish, concerning the race of grand jury forepersons, including the foreperson at the time the defendant was indicted.
Tina Bourgeois Richard testified that she gave a statement to an investigator sometime after Greco’s trial wherein she heard Falcon at a Mardi Gras parade state that he was the person who stomped the victim’s head. She also testified that she had dated Greco briefly in the past, but she had lost touch with him. The defense also introduced a statement from Felix Bourgeois which indicated he heard Falcon make the same admission at the parade, as well as later admission that he stomped the victim’s head because he was not yet dead.
La At the August 28 hearing, Sadie Williams Guey testified she was an investigator for the district attorney’s office in 1988 and 1989. She testified she worked on the defendant’s case, and she stated she was present during various interviews with Falcon. She identified a handwritten document which were her notes taken during an interview occurring shortly before trial between Falcon and District Attorney Bu-brig, who actually tried the case.
Danny Atwell testified he was now living in Mississippi. He stated he was thirteen or fourteen at the time of the shooting. He testified the police picked him up the day after the shooting and interviewed him without his parents being present. He insisted he told the officers that he heard Falcon, not Greco, say in T.P.’s parking lot that they should “roll” McGonigal. He maintained that the officers told him that “others” had said Greco was the person who made this statement, and if he did not also so state, they would charge him as an accessory to murder because he was present both before and after the shooting. He stated this first interview was not taped, and the officers told him not to speak with anyone about the case, especially the defense attorney. He stated that the next time the police interviewed him, his mother was present, and the police taped the interview. He testified the tape was stopped several times, however, when his statements did not match what the officers wanted him to say. He stated that the officers again threatened to charge him with accessory to murder if he did not say what they wanted him to say. *1162 He stated they also told him that if he made the statement, he would not have to testify at trial. However, he was called to testify, and again he was warned to testify that he heard Greco say he wanted to “roll” the victim. He admitted he lied at trial on this point, but he explained he did so because he was told that if he testified differently than what was in his statement, he could be |I3charged with perjury. He stated this lie had bothered him for many years, and sometime in 1997 he contacted someone in Greco’s family and told her about his false testimony. He denied being paid for his testimony at the hearing.
Patricia Alwell Carriere, Danny’s mother, testified her son was crying when she picked him up from the police station on the day he was first interviewed. She testified Danny told her the police had told him he had to say Greco was the person who said he wanted to “roll” the victim. She reiterated that they were told Danny would not have to testify at trial if he gave a written statement so stating. She stated they were told not to speak with the defense attorney about the case, and she insisted the officers threatened to charge Danny with being an accessory to murder if they did so. She testified she was present when Danny gave his second, taped statement, and she insisted the officers stopped the tape several times when Danny did not say what they wanted him to say. She admitted that on the tape she answered that neither she nor Danny had been threatened during the statement, but she insisted she did so because she did not want Danny to go to jail.
Bernell Jackson testified he was now living in Houston. He testified he was interviewed in 1988 by Det. Weaver and Sadie Williams [Guey] about the events in T.P.’s parking lot. He stated he told them that he argued with McGonigal in the parking lot because McGonigal was trying to sell him some drugs, and he told McGo-nigal he was not interested in buying any. He testified he told them that Falcon, not Greco, told William Carr they should “roll” the victim, but they indicated they did not want to hear that statement. He testified that this statement was not included in his written statement, which was taken after he had read the statements of other witnesses. He insisted Det. Weaver and Ms. Williams Guey | ]4told him that he would be charged if he spoke to the defense attorney about the case.
At the October 30 hearing, Ms. Guey denied telling any of the State’s witnesses that they would be criminally charged if they spoke to the defense attorney prior to trial. Det. Weaver denied telling any witnesses to lie at trial or they would be prosecuted for a crime. He identified Breck Falcon’s second statement, taken on June 22, 1988, which he indicated would have been in the district attorney’s file.

DISCUSSION

Failure to Rule on Procedural Objections/Argument One

In its application, the State argues the trial court erred by quashing the indictment against the defendant and vacating his conviction and sentence. The State first argues the trial court erred by failing to rule on the State’s procedural objections before even considering the merits of the allegations in the defendant’s application for post conviction relief. The State cites La.C.Cr.P. art. 928, which provides that a trial court may summarily dismiss an application for post conviction relief if the application “fails to allege a claim which, if established, would entitle the petitioner to relief.” The State argues that because the defendant confessed to shooting the victim and taking his money, nothing in the allegations of the application would entitle him to relief. However, the facts show that even at trial the defendant insisted the *1163 confession did not accurately reflect what he told the officers, and that the present judge had credibility problems with the two officers who took the defendant’s statement. The thrust of many of the defendant’s claims were based on what he contended was misconduct on the part of the same | ^police officers and the same district attorney’s investigator in forcing two witnesses to testify falsely at trial.
The State quotes language from State ex rel. Cormier v. State, 95-2208 (La.10/4/96), 680 So.2d 1168, which indicates the trial court must determine from the allegations in the application that the claims if proved would entitle the defendant to relief before actually ordering an evidentiary hearing on the matter. However, the writ in Cor-mier was taken by a defendant from the trial court’s refusal to order an evidentiary hearing. The paragraph preceding the paragraph quoted by the State noted:
Writ granted; case remanded. Relator alleges that of his present constitutional claims (that the state suppressed material exculpatory evidence at trial in violation of the principles set out in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny) rests on facts not known to him or his attorney and which did not become known to him until he obtained documents pursuant to the Public Records Act, R.S. 44:1 et seq. Relator therefore appears to have raised a claim which falls under La.C.Cr.P. art. 930.8(A)(1), which provides an exception to the three-year time limit for filing applications for post conviction relief.
Cormier, at p. 1, 680 So.2d at 1168. Here, as in Cormier, the defendant raised Brady claims based upon documents he received in response to public record requests he could not make until after his conviction and sentence were final. Thus, Cormier upholds the trial court’s refusal to dismiss the application summarily.
In addition, the State did not file its procedural objections until August 26, 2002, years after the applications were filed and only two days before the second hearing was held on the application. Indeed, at the conclusion of the April 24, 2002 hearing, the prosecutor did not object to a continuance of that hearing, Instating: “The State doesn’t have a problem with giving Mr. Greco every opportunity to present his evidence at a hearing. So, we don’t object to having an additional day of hearing, Your Honor.” In addition, at the conclusion of the August 28 hearing, the court denied the State’s motion to dismiss the applications summarily. The State did not seek writs from this ruling, but instead now raises it in the present application.
The State further argues that the trial court should not have considered the applications on the merits because the defendant “inexcusably omitted them from a prior application.” However, the Brady and prosecutorial misconduct claims could not have been raised on appeal because they are based upon evidence found in the district attorney’s files which the defendant could not obtain until after his conviction and sentence became final. In addition, there are no “prior” applications. The present applications are his first applications; it merely took years for the court to rule on them.
In sum, the trial court did not err by refusing to dismiss the defendant’s claims summarily and instead hold hearings on the merits of the claims.

Quashing of the IndictmentlArguments Two and Three

The State argues the post-conviction court erred by quashing the indictment against the defendant based upon his claim of discriminatory practices in choosing grand jury forepersons in Plaquemines *1164 Parish at the time the indictment was returned. See Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998). The State correctly points out that the defendant was estopped from raising this claim because he failed to file a motion to quash the indictment prior to trial. See Deloach v. Whitley, 96-1901, pp. 1-2 (La.11/22/96), 684 So.2d 349, where the Court stated:
|17AI1[1] equal protection claims arising out of the selection or composition of grand juries in Louisiana remain subject to this state’s procedural requirements. Francis v. Henderson, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976). Counsel must assert the equal protection claim in a pre-trial motion to quash or waive any complaint in that regard. Francis, 425 U.S. at 539-542, 96 S.Ct. at 1710-11; State v. Lee, 340 So.2d 180, 182 (La.1976) (motion to quash is the appropriate vehicle for challenging the validity of a grand jury indictment, composition, or selection process); State v. Dillard, 320 So.2d 116, 120 (La.1975) (failure to file a motion to quash before trial waives any challenge to the grand jury); State v. White, 193 La. 775, 192 So. 345, 348 (1939) (same); cf., Johnson v. Puckett, 929 F.2d 1067, 1069 (5th Cir.1991) (“At his trial, Johnson, a black male, moved to quash the indictment because of racial discrimination in the selection of the grand jury foreman but the motion was denied.”); Guice v. Fortenberry, 661 F.2d 496, 501, n. 7 (5th Cir.1981) (same), appeal after remand, 722 F.2d 276 (5th Cir.1984).
Here, there is no indication the defendant filed a motion to quash the indictment in this case prior to trial, and in his response the defendant concedes no motion was filed. Thus, he is estopped from raising this post conviction claim, and the trial court erred by granting relief and quashing the indictment. The State’s claim on this point has merit.

Incomplete Trial Transcript/Argument Four

The post-conviction court also granted relief on the defendant’s claim that he was deprived of his right to a meaningful appeal because the trial transcript he subsequently obtained was incomplete. Apparently the defendant obtained the transcript after his appeal, and at that time it did not contain the testimony of four witnesses nor the opening statements or closing arguments. According to the August 2002 transcript, the defendant subsequently received the transcripts of all 1 isbut the testimony of the criminalist and the opening statements and the closing arguments. The trial court found that because these portions of the transcript were missing, the defendant was deprived of his right to a full transcript on appeal.
The defendant’s claim has no merit. The defendant had private counsel on appeal, and the it appears that any omissions from the record at that time can be attributed to the decision of defense counsel that certain portions of the record were not needed for the appeal and, therefore, those portions were not selected for designation as part of the record on appeal. This court supplemented the record with Falcon’s June 21, 1988 statement in order to address one of the assignments of error. However, the defendant did not claim in his appeal that the trial transcript was incomplete. Thus, as noted by the State in its present application, any claim is barred by La.C.Cr.P. art. 930.4 because the defendant failed to raise the issue on appeal. In addition, although the trial court found that these missing portions of testimony *1165 deprived the defendant of his right to a full review of his post conviction relief application, the cases it cited in support of this finding all deal with a defendant’s right to a full appellate revieiv as guaranteed by the Louisiana Constitution. There is no analogous right to a full review for purposes of post conviction relief. Therefore, the trial court erred by granting relief on this basis.

Brady, Prosecutorial Misconduct, and Statement Claims IArguments Five and Six

Although the State’s application separates the arguments with respect to withheld statements and the trial court’s finding that the validity of the defendant’s statement was in doubt, these matters are logically best considered together |1flbecause the continued validity of the defendant’s statement is dependent upon the court’s findings as to the defendant’s Brady claims.
The post-conviction court found the State withheld exculpatory and impeachment material which cast doubt upon the reliability of the jury’s verdict. In State v. Crawford, 2002-2048, pp. 10-11 (La.App. 4 Cir. 2/12/03), 848 So.2d 615, this court set forth the standard for determining the merits of a Brady claim:
To comport with the dictates of the due process clause of the Fourteenth Amendment, the State must disclose to the defense evidence that is favorable to the defense and is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Porter, 98-0279 (La. App. 4 Cir. 3/15/00), 756 So.2d 1156, writ denied, 2000-1135 (La.1/10/02), 790 So.2d 3. Included in this rule is evidence that impeaches the testimony of a witness whose credibility or reliability may determine guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). “[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment.” State v. Rosiere, 488 So.2d 965, 970 (La.1986). See also Porter, supra.
Materiality was defined in U.S. v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985): “The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” The same test is to be employed whether or not the defense makes a pretrial request for exculpatory evidence. Bagley; State v. Phillips, 92-1063 (La.App. 4 Cir. 1996), 670 So.2d 588.
In Kyles v. Whitley, 514 U.S. 419, 434-435, 115 S.Ct. 1555, 1565-1566, 131 L.Ed.2d 490 (1995), the Court discussed “materiality”:
Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of | ^materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant’s acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).... Bag-ley’s touchstone of materiality is a “reasonable probability” of a different result, and the adjective is important. The question is not whether the de *1166 fendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A “reasonable probability” of a different result is accordingly shown when the Government’s evidentiary suppression “undermines confidence in the outcome of the trial.” Bagley, 473 U.S., at 678, 105 S.Ct., at 3381.
The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient eviden-tiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
Here, the defendant’s Brady claims were based upon various statements made by Breck Falcon. Prior to trial, the State obtained a ruling from this court that the defendant was not entitled to the production of Falcon’s statement to the police. See State v. Greco, unpub. 88-2507 (La. App. 4 Cir. 1/13/89).
li^The minute entries of trial indicate that prior to the testimony of Det. Colu-drovich and Det. Weaver, the State produced the July 4, 1988 supplemental police report written by Det. Weaver. In this report, Det. Weaver stated that after the shooting Falcon asked Greco why he had shot the victim, and Greco replied he did so because the victim “threw at me and he f_d up.” The report also noted that the police arrested Falcon for being an accessory after the fact to first degree murder.
On appeal, the defendant argued the trial court erred by denying his motion, made during the direct examination of Falcon, for the production of Falcon’s statement to the police. In connection with the review of this assignment, this Court obtained Falcon’s June 21, 1988 statement. In this statement Falcon indicated that “they was [sic] talking about beating [the victim] up and taking his money” while at trial Falcon testified that he heard Greco say he should “roll” the victim, which Falcon took to mean beat him. In addition, in this statement Falcon did not mention hearing Greco order the victim to give him his money. However, when asked if Greco took anything from the victim, Falcon replied that Greco took a $20 bill out of the victim’s pocket. In response to a question as to why Greco shot the victim, Falcon replied: “For his money, I guess.”
This court rejected the defendant’s claim on appeal, noting that the trial court conducted an in camera inspection of the statement and found no Brady material. This court also reviewed the statement and found the trial court did not err in so ruling. State v. Greco, 575 So.2d 407 (La. App. 4 Cir.1991).
Falcon also gave a second statement on June 22, 1988, which was not produced for the defense until April 2002. In this statement, Falcon stated he heard Greco in T.P.’s parking lot say, “Let’s just beat him up right here.” Falcon | gpagain recounted the argument between Greco and the victim as the victim began walking back toward the highway, as well as Greco’s declaration to Falcon that he was going to kill the victim. In addition, Falcon stated that *1167 he heard Greco say “give me your money”, and then he heard the shots. He also stated that when he and Greco dumped the victim’s body, Greco turned the victim over, ripped the victim’s back pocket, took a bank book out of the pocket, and then turned the victim back over and took money out of the victim’s front pocket. He further stated that Greco stomped on the victim’s head to make the victim stop moaning. In this statement, Det. Weaver asked Falcon if he asked Greco or if Greco told him why he killed the victim, and Falcon replied “he threw a punch at him”. Weaver then asked, “Joe told you that he threw a punch at him, did he say anything else”, to which Falcon replied, “he said that he that [sic] the guy threw a punch at him and he f_d up.” Falcon insisted he did not get any of the money Greco took from the victim, and he asserted that he would not have gone with Greco and the victim if he had known Greco was going to rob the victim.
In addition to the statements noted above, the defense obtained the notes Ms. Williams (Guey) took during an interview between the district attorney and Falcon just a few days prior to trial. The only additional information in these notes concerned a statement by the victim to Ber-nell Jackson, threatening to “kick your ass.” In addition, there is some reference to the victim claiming to have a gun and that no one would “mess with him.”
In its reasons for judgment granting the defendant’s application for post conviction relief, the trial court found that these statements should have been produced at trial to allow the defendant to impeach Falcon’s testimony, especially with respect to Falcon’s statement in the 6/21/88 statement that “they” were going |?,3to roll the victim, thereby implicating other State’s witnesses, and his statement to the district attorney just prior to trial that the victim made some reference to having a gun and no one “messing” with him. The State now argues that even if these statements had been produced, this information would not have affected the jury’s verdict because the jury was also aware of the defendant’s confession wherein he admitted robbing the victim after he shot him. In addition, the State points out that the coroner’s testimony concerning the effects the shots must have had on the victim discounted the defendant’s statements that the victim was able to continue coming at him after the first shot, which the defendant contended occurred when he tripped while backing away from the victim.
The State is correct in its assertion with respect to the production of Falcon’s statements. Although Falcon did not mention the “give me your money” quotation in the 6/21/88 statement, this omission does not mean that Greco did not say these words or their equivalent. The trial court placed great emphasis on the fact that in the same statement Falcon said that he “guessed” that Greco shot the victim for his money”. The fact remains that in the first statement as well in his other statements and his trial testimony he stated that Greco took money from the victim’s pocket. In all statements Falcon indicated Greco stated in the parking lot of T.P.’s that he should “roll” or “beat up” the victim. As found by this Court on appeal, the trial court did not err by finding the 6/21/88 statement did not contain exculpatory material which cast doubt on the validity of the jury’s verdict.
The trial court found the other statements, the 6/22/88 statement and the 1/12/89 notes of the interview with the district attorney, also contained exculpatory impeachment evidence in the form of Greco’s statements to Falcon that the victim had swung at Greco just prior to the shooting (the 6/22/88 statement) and Fal *1168 con’s preference to the victim stating he had a gun and that no one would “mess” with him (the 1/12/89 notes). It is true that the production of the 6/22/88 statement that Greco told Falcon that the victim swung at him would have bolstered Greco’s self-defense claim, but at best it would have been Greco’s self-serving statement to Falcon after the shooting; the information in the statement was not that Falcon himself saw the victim swing at Greco before Greco shot him, a fact that would have bolstered Greco’s self-defense claim to a much greater degree.
Likewise, the statement in the 1/12/89 notes to the effect that the victim mentioned having a gun and no one “messing” with him probably would not have affected the verdict because the defendant did not testify that he knew the victim made this statement or that he even suspected the victim was armed. At best, the production of this statement showed that the victim believed he could defend himself; it doe's not show the victim actually advanced on the defendant or that the victim actually acted in self-defense.
In sum, the impeachment information in these statements would not have contributed to the verdict had they been produced. As such, the trial court erred by granting relief on this issue, and the State’s argument has merit as to Falcon’s statements.
But the issue in this case that overshadows all others is the trial court’s finding of police and prosecutorial misconduct. The court found that Alwell’s and Jackson’s recantation of their pretrial statements and their trial testimony proved Det. Weaver and Investigator Williams Guey forced Alwell and Jackson to lie both in their pretrial statements and at trial when they quoted Greco as saying he was going to “roll” or beat the victim. The court further found Alwell’s and Jackson’s testimony cast doubt on the credibility of Weaver and Williams Guey, both as to | astheir taking of Alwell’s and Jackson’s statements and their taking of the defendant’s confession. The court found that the- evidence of the officers’ suborning perjury made the defendant’s claim that Det. Weaver did not accurately record his statement much more credible.
As noted by the trial court, in State v. Doleman, 2002-0957, p. 17 (La. App. 4 Cir. 12/4/02), 835 So.2d 850, 861, writ den. 2002-3101 (La.9/19/03), 853 So.2d 633, this Court set forth the standard for evaluating a claim of prosecutorial misconduct by suborning perjury:
Where a prosecutor allows a State witness to give false testimony without correction, a reviewing court must reverse the conviction if the witness’s testimony reasonably could have affected the jury’s verdict, even if the testimony goes only to the credibility of the witness. Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); State v. Broadway, 96-2659, p. 17 (La.10/19/99), 753 So.2d 801, 814; State v. Williams, 338 So.2d 672, 677 (La.1976). To prove a Napue claim, the defendant must show that the prosecutor acted in collusion with the witness to facilitate false testimony. Broadway, 96-2659, p. 17, 753 So.2d at 814. Furthermore, fundamental fairness, i.e., due process, is offended “when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.” Napue, 360 U.S. at 269, 79 S.Ct. 1173. When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. Broadway; 96-2659 at p. 17; 753 So.2d at 814; Giglio v. United States, 405 U.S. *1169 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, the grant of a new trial based upon a Napue violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material. United States v. O’Keefe, 128 F.3d 885, 893 (5th Cir. 1997).
In the instant case, the trial court listened to the testimony of Alwell, Jackson, Det. Weaver, and Ms. Williams Guey concerning whether Alwell and |2fiJackson were forced to testify that they heard the defendant say or heard that from a third party that the defendant said he was going to “roll” or beat the defendant. Recantations of trial testimony are highly suspect, of course, and only in rare circumstances should a second trial be granted on that basis. State v. Clayton, 427 So.2d 827 (La.1982); State v. Haygood, 26,102 (La. App. 2 Cir. 8/17/94), 641 So.2d 1074. See also: State v. Guidry, 94-678 (La.App. 3 Cir. 12/7/94), 674 So.2d 502. Such a disclaimer is tantamount to an admission of perjury do as to discredit the witness at a later trial. State v. Wright, 598 So.2d 561 (La.App. 4 Cir.1992). However, in Wright, supra, the trial court also stated that:
In the instant case, at the hearing on the motion for new trial, the trial court was confronted with accepting the testimony of Zelda Guss or the recanted testimony of the victim — -a credibility question. The Louisiana Supreme Court has stated: “where credibility is involved the trier of fact is undoubtedly better situated to make the determination.... ” State v. Tyler, supra[, 342 So.2d 574 (La.1977)].
Wright, 598 So.2d at 563.
In the instant case, the trial court made a credibility determination on the conflicting testimony and found Alwell’s and Jackson’s recantation testimony credible. At first blush this would seem to put the trial court’s credibility call well within the ambit of that judge’s discretion as delineated by Wright and Tyler. Unfortunately, it is not quite that simple. In Wright, Haygood, Clayton, and Guidry, the courts in making their credibility calls rejected the recanted testimony and the higher courts sustained that rejection because of the notoriously unreliable nature of recanted testimony in preference to that of the police and prose-cutorial authorities. We must add to this the fact that the trial testimony of Det. Weaver and Det. Coludrovich had already been found implicitly to be credible. Thus, we are faced with a case in which the trial court could be characterized, at least to a | ^certain extent, as setting up its credibility calls based on recanted testimony at cross purposes with direct testimony implicitly deemed credible by the jury. The jury apparently believed the testimony of Dets. Coludrovich and Weaver over that of the defendant, who denied stating he had robbed the victim. However, by the time of the post conviction hearings, the trial court had not only the transcript of both detectives’ trial testimony as well as Det. Weaver’s live post conviction testimony, but also Danny Alwell’s and Bernell Jackson’s live testimony that Det. Weaver and Ms. Williams Guey had suborned perjury. Because the attack on Det. Weaver’s credibility was not presented to the jury, the trial court was apprised of information the jury did not have, and it was not necessarily bound by the jury’s credibility determination with respect to the accuracy of the statement. The court found that Alwell’s and Jackson’s testimony at the post conviction hearing so damaged the officers’ testimony as to the circumstances under which the statement was made and the accuracy of the statement that the statement’s validity was called into doubt. This finding, added to the trial court’s finding that the officers and the district attorney’s investigator suborned perjury, would support a *1170 finding that the defendant was deprived of a fair trial.
Moreover, as the trier of fact, the trial court was not limited to viewing the testimony in the light most favorable to the prosecution, as argued by the State; that Jackson v. Virginia[2] standard is to be applied by an appellate court in reviewing the sufficiency of evidence to support a conviction. The issue before the trial court was not the sufficiency of the evidence to support the conviction; instead, the court was faced with a claim of prosecutorial misconduct based upon the detective and the district attorney’s investigator suborning perjury. The trial 18Scourt was the fact finder with respect to the credibility of the witnesses, and a fact finder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, 2000-1082 (La. App. 4 Cir. 2/6/02), 809 So.2d 1093[3]; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. The trial court viewed the witnesses, and given the testimony by both Alwell (corroborated by that of his mother who testified at a post conviction hearing but not at the original trial) and Jackson, whose lives have apparently diverged since 1988 when the shooting occurred, there is no reason for this court to find that the trial court abused its discretion by finding Alwell and Jackson more credible than Weaver and Ms. Williams Guey.
Using the Doleman standard set forth above, the “perjured” testimony was that Alwell and Jackson heard the defendant say or hear from others that the defendant said he would “roll” or beat the victim; both men insisted at the August 2002 hearing that they heard Falcon say this but were told to attribute this statement to the defendant. As noted by the State, Alwell’s and Jackson’s testimony by itself was merely cumulative of similar testimony by Falcon and Carr. However, as pointed out by the trial court, as the only other person who was present when the shooting occurred, Falcon had every reason to cast himself in the best possible light. Nonetheless, it is not clear that the “suborned perjury” was such that there was “no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial”[4] given the fact that Carr, who admittedly had no reason to testify falsely, also testified he heard the defendant say he should “roll” the victim.
| ¡>,c|The State maintains that Alwell’s and Jackson’s recantations and their testimony concerning being coerced into committing perjury really have no effect on the validity of the jury’s verdict because the defendant admitted in his confession that he took money form the victim after shooting him. The State appears to argue that this court considered on appeal a claim as to the defendant’s confession. No assignment was raised on appeal as to the defendant’s confession. The State argues that because both Det. Coludrovich and Det. Weaver testified at trial as to the circumstances under which the defendant’s statement was taken, the jury as the finder of fact obviously found their testimony was more credible than that of the defendant, who insisted the statement he signed did not accurately reflect the statement he gave in that he denied stating he had taken money from the victim. However, by the time of the post conviction hearings, the trial court had not only the transcript *1171 of the detective’s testimony, but also Al-well’s and Jackson’s that Det. Weaver and Ms. Williams Guey had suborned perjury. Because this attack on Det. Weaver’s credibility was not presented to the jury, the trial court was apprised of information the jury did not have, and it was not necessarily bound by the jury’s credibility determination with respect to the accuracy of the statement. The court found that Atwell's and Jackson’s testimony at the post conviction hearing so damaged the officers’ testimony as to the circumstances under which the statement was made and the accuracy of the statement that the statement’s validity was called into doubt. This finding, added to the trial court’s finding that the officers and the district attorney’s investigator suborned perjury, support a finding that the defendant was deprived of a fair trial.
Moreover, the trial court did more than merely make the conelusory finding that the recanted testimony was more credible than that offered by the prosecution. 13n In addition to the usual subjective factors involved in making credibility determinations based on observing the demeanor and tone of the witnesses, the trial judge gave sound objective written reasons for deciding to credit the recanted testimony:
While a teenager at the time of the killing and trial, he [Danny Alwell] is now an adult, married with children and a resident of Mississippi with no reason to appear in court in this Judicial District [he was not subpoenaed] and fabricate testimony on the part of an individual serving a life sentence and against an individual who is free and at large. His demeanor was such that, when viewed together with the circumstances, convince the Court that he is now telling the truth.
Likewise, Bernell Jackson appeared at the hearing from Houston, Texas and related the same circumstances, convince the Court that he is now telling the truth.
The issue of prosecutorial misconduct is a close one. We are aware, as pointed out by the State in its application, that the Plaquemines Parish District Attorney’s office has a reputation free of this sort of problem. However, where the trial court is entitled to make credibility calls as it was in the post conviction hearings, and where the trial court gave good reasons in support of its credibility calls, we cannot say that it abused its discretion in making those calls. We would be overreaching the province of a reviewing court if we were to substitute our own credibility calls for those of the trial court under these circumstances. Therefore, we are compelled to sustain the credibility calls made by the trial court.

Cumulative Effect of All ErrorslArgument Seven

Lastly, the trial court held that all the above-mentioned errors, if not reversible separately, cumulatively deprived the defendant of a fair trial. However, as noted above, the trial court erred by finding merit in most of these claims. We find no merit in this finding by the trial court.

^CONCLUSION AND DECREE

The State’s argument that the trial court’s entire ruling is invalid because it failed to rule on the State’s procedural objections has no merit. However, the State is correct that the trial court erred by quashing the indictment due to the method for selecting grand jury forepersons at the time the defendant was indicted; the defendant failed to file a pretrial motion to quash the indictment and was estopped from raising this issue in his application for post conviction relief. Likewise, the trial court erred by granting relief on the issue of the missing portions *1172 of the trial transcript. The trial court also erred by granting relief on the defendant’s Brady claim concerning the State’s failure to produce all of Falcon’s statements and Ms. Williams Guey’s notes on his pretrial interview with the district attorney.
However, we cannot say that he trial court abused its fact finding discretion in finding that the defendant was entitled to relief based upon the i-ecantations of Al-well and Jackson and their claims that the law enforcement officers and Ms. Williams Guey suborned perjury. Accordingly, we grant the writ in part, reverse the trial courts quashing of the indictment, and reinstate the indictment against the defendant. Moreover, we affirm that portion of the trial court’s post conviction judgment granting the defendant a new trial.
WRIT GRANTED; JUDGMENT REVERSED IN PART; INDICTMENT REINSTATED; JUDGEMENT AFFIRMED IN PART; NEW TRIAL ORDERED.

. Emphasis original.

. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

. Writ den. 2002-0703 (La.11/1/02), 828 So.2d 564

.The Doleman standard.