756 So.2d 1156 (2000)
STATE of Louisiana
v.
Alphonse PORTER.
No. 98-KA-0279.
Court of Appeal of Louisiana, Fourth Circuit.
March 15, 2000.
Harry F. Connick, District Attorney, Holli Herrle-Castillo, Assistant District Attorney, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, Louisiana, Counsel for Defendant/Appellant.
(Court composed of Judge WILLIAM H. BYRNES, III, Judge JOAN BERNARD ARMSTRONG, Judge MICHAEL E. KIRBY).
KIRBY, J.
By grand jury indictment, the defendant, Alphonse Porter, was charged with first degree murder, a violation of La. R.S. 14:30. He pled not guilty.[1] At defendant's *1157 first trial in October 1996, the jury was unable to reach a verdict and a mistrial was declared. At his second trial on April 2-5, 1997, the defendant was found guilty of second degree murder, a violation of La. R.S. 14:30.1. Defendant filed motions for post-verdict judgment of acquittal and new trial, which the trial court denied. Defendant was sentenced that day to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. He now appeals.

STATEMENT OF THE FACTS
On March 26, 1995, Troy Mouton, Penny Schexnayder, Bryson Corso, Amy Fontenot, Jonathan Pellegrin, and Zane Garnette drove to New Orleans for Penny's birthday. Corso testified that he drove the group in the car he and Amy Fontenot owned from the Houma-Thibodeaux area and that they arrived in New Orleans at around noon. He testified that they went to the lakefront and went out on a friend's boat. He also stated that they went to a charitable function and admitted having four or five drinks. Corso testified that they started to drive home at around 9:30 p.m.; but, when he could not find the interstate, they decided to stop at Wendy's to get something to eat. He said that because Troy and Penny started arguing, he pulled over to a bar called the Spider's Web so that Amy Fontenot could drive. After they stopped, Penny got out of the car and sat on the sidewalk; and, Troy went over to her to get her back in the car. Corso testified that he and Amy switched places in the car, and that Jonathan stayed in the back seat.
Corso stated that at this point, two men came out of the bushes and went on either side of the car. He said that the one who came to his side of the car was armed with an Uzi-type weapon and ordered him out of the car. As Corso got out of the car, the man went through his pockets and then reached inside the car, taking some change that was on the center console. Corso testified that the man saw Troy and Penny and walked towards them; but, he further stated that he then looked over toward Amy because she was refusing to give the car keys to the other man. After he told Amy to give the man the car keys, he heard a gunshot. He turned and saw the first gunman run away, then turn and shoot Troy in the chest. Corso saw the gunman jump into a car that had just pulled up to the curb. He saw the other robber also jump into that car. Corso later identified the shooter as the defendant at a photographic lineup.
Dr. Susan Garcia performed the autopsy on Troy Mouton and testified that he was declared dead at 1:55 a.m. on March 27, 1995. She stated that he died of a gunshot wound to the chest which caused injuries to his liver, pancreas, and the artery leading to his left kidney. She also stated that his blood alcohol level was .04 percent.
Detective Archie Kaufman testified that he was the lead homicide investigator and learned that several items had been taken, including Penny Schexnayder's ATM card. He contacted the bank, and Rokeya Knight testified that she retrieved pictures from the video camera at the Premier Bank branch on Read Boulevard showing that someone attempted to use the ATM card between 11:06 and 11:10 on the night of March 26. Kaufman testified that he showed the pictures from the ATM to Detective Herman Cade who identified the person in the picture as defendant. He then put together a photographic lineup that he showed to Corso, Schexnayder, and Pellegrin, all of whom selected defendant's photograph. Kaufman testified that after defendant was arrested, he showed him the picture from the ATM machine. He said that defendant admitted that was him in the picture, but he stated he would not tell where he got the ATM card.
Officer Robert Kelly testified that he was on his way to work when he drove past a bar at Elysian Fields and Filmore and saw a woman chasing a car that sped away. He got behind the vehicle the woman had chased and wrote down the license plate number just in case it was some sort of an incident. He stated that he saw *1158 three black males in the car. He described the car as a white four-door with either a dark blue or black vinyl roof. When he arrived at the station for work, the report of the shooting came in; and, he returned to the scene. Detective Kaufman testified that a check of the license plate number indicated that the car had been stolen. He said that the car was later recovered on April 3; but, that it had a temporary license plate and two doors, not four. He also stated that he spoke with two of the people found in the car, Freddie Pollard and Carlson Young, and concluded that they were not involved in the homicide.
Officer Glen Burmaster performed an examination of fingerprints lifted from various items of evidence; and, he did not find defendant's fingerprints on any of them. He compared the fingerprints on a business card and an insurance renewal notice to those of defendant, Kendall Young, Freddie Pollard, Carlson Young, Troy Mouton, and Penny Schexnayder and found no match. He also stated a palm print taken from the exterior driver's side of Fontenot's and Corso's car was not suitable for matching. He also did not find defendant's prints in the stolen car.
Jonathan Pellegrin testified about the trip to New Orleans with his friends and said that they stopped at the Spider's Web because a friend of his worked there. When they stopped, he said that Troy and Penny got out of the car and that Zane followed them to make sure that they would not get into a major fight. Jonathan stayed where he had been, which was seated behind the driver; and, he looked up when he heard someone demanding money. He saw a man with a gun next to Bryson, who had switched places with Amy; and, he testified that he looked right at the man with the gun for a few seconds and was then hit in the side of the face by a second person. This person demanded money, and Jonathan stated that he could not find his wallet in his pockets. He said that the man then punched him in the chest and yanked off the gold chain he wore around his neck. Jonathan testified that the man pulled him out of the car and that he saw the man and Amy fighting over the car keys. He stated that the man called over to the man with the gun and said, "Trey, give me the Mac." He then heard a shot and dove into the car. He looked out of the car and saw the man with the gun struggling with Penny. Jonathan stated that Troy broke the man's grip and that as the man went toward the street, he turned around and shot Troy. He saw the man jump into a car that Penny pursued and grabbed, but he said that the car shook, causing Penny to fall.
Penny Schexnayder testified that after going to the lakefront for a leukemia charity function and out on a friend's boat, she, Troy, who was her fiancé, and their friends decided to return home. She admitted drinking some beer and four or five Crown Royal and water cocktails. She stated that she and Troy began to have an argument because she did not want to go home. Penny stated that because she and Troy were arguing, the car stopped and she got out. She stated that Troy also got out to ask her to get back in and that after they talked, the argument ended. She further stated that Zane came to see if they were okay and then after he walked away, she heard a gunshot. She testified that when she turned, the shooter grabbed her by the arm and took her purse. She said that Troy grabbed her to pull her away from the shooter, whom she later identified as defendant, and separated them and that defendant then ran away. Penny further stated that Troy chased after him, and she chased after Troy, who jumped to grab defendant. She said that defendant then shot Troy and laughed. She chased him and jumped onto the back of the car he just entered. She said that she then either fell off or was thrown off of the car.
Mardell Condoll testified that defendant is her brother and that she and defendant were at a wedding rehearsal on the West Bank on the night of March 26 and that they left at 10:00 p.m. She said that they returned to their grandfather's house, *1159 where they lived, at 10:30 p.m. She further testified that after they got home, defendant sat out on the porch and that she heard a man walk up and talk to defendant. She saw that the man, whose name was Jessie, had a bank card in his hand and that he and defendant left. She was shown Defense Exhibit 6, which was a composite of the ATM photograph, and identified the man in the picture as Jessie.

ERRORS PATENT
A review of the record shows no errors patent.[2]

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant complains that the statements of Freddie Pollard and Carlson Young should be examined for a determination of whether they contain exculpatory evidence. Defendant argues that these statements contradict the trial testimony of Detective Archie Kaufman.
The State must disclose to the defense evidence which is favorable to the defendant and is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Phillips, 92-1063 (La.App. 4th Cir. 2/29/96), 670 So.2d 588, writ denied 96-2131 (La.9/5/97), 699 So.2d 85. Although the prosecutor is not required to deliver his entire file to defense counsel, he must disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. State v. Rosiere, 488 So.2d 965 (La.1986).
In United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the United States Supreme Court stated that evidence was material only if there were a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. The court further stated that a "reasonable probability" was a probability sufficient to undermine confidence in the outcome. In Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the court further discussed the concept of materiality and stated that a showing of materiality did not require a demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The court also stated that the question was not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, which was understood as a trial resulting in a verdict worthy of confidence. Id. The court also stated that the defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. Id.
The supplemental police report states that Detective Kaufman spoke with Young after he was arrested in the stolen Buick with Joshua Conerly and Eric Smith. The report states that Young had no knowledge of the shooting. The report further states that Kaufman spoke with Pollard and his mother and that Pollard told Kaufman that he first saw the stolen car on March 27, 1995 at about 5:00 p.m. near his house. Pollard further stated that the car was driven by a male he knew only as "Leon" and that he had been in the car several times. He also stated that he was at home on the night of the shooting, which his mother verified. At trial, Kaufman testified that Pollard and Young were eliminated as suspects in the homicide based on a brief interview with them.
The statements of Young and Pollard do not contain any exculpatory evidence that was improperly withheld by the State. Young's statement that he knew nothing about the shooting does not exculpate defendant in any way. Pollard's statement shows that he did not see the car until the day after the shooting, which does not *1160 exculpate defendant; and, his alibi for the time of the shooting does not exculpate defendant. Additionally, these statements do not contradict Kaufman's testimony. Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, defendant complains that the case should be remanded to the trial court for a hearing on whether or not the State instructed Penny Schexnayder as to what her testimony should be. In its brief, the State points out that at the end of trial, a hearing was held in chambers during which Ms. Schexnayder was asked whether she had been told by the prosecutors what to say on the witness stand. Ms. Schexnayder denied being told what to say by the prosecutors and testified that they talked about clothes and that she had lipstick on her teeth. The hearing was held after an investigator for the O.I.D.P. told defense counsel that he heard the end of a conversation between the prosecutors and Ms. Schexnayder in which the prosecutors told her that they had not told her to say that and that was not what she had said at the last trial. The investigator stated that they looked startled and stopped talking when he walked in and that they changed to a more casual conversation. One of the prosecutors told the trial judge that if Ms. Schexnayder had testified differently from the previous trials, defense counsel would have brought it to the jury's attention.
Defendant argues that because he raised a serious issue, a full determination of the underlying facts should have taken place and that the trial court erred in denying his motion for new trial without addressing this particular claim. A review of the trial transcript does not indicate that the trial court made a specific ruling regarding defendant's allegations of prosecutorial misconduct after Ms. Schexnayder testified or at the hearing on the motion for new trial. The trial judge asked defense counsel if he was making a motion for mistrial; and, defense counsel responded that before he would do that, he wanted to find out more from the parties involved. After Ms. Schexnayder testified, no specific request for relief, such as a motion for mistrial, was made, although the issue was raised in the motion for new trial. A review of the transcript from the motion for new trial shows that no argument was made regarding this particular allegation. Even though no specific ruling was made on this issue, it will be assumed that the trial court found no merit to defendant's claim of prosecutorial misconduct.
Defendant does not state what other facts he wishes to develop at a new hearing; and, it is difficult to see what other facts would be established at a new hearing since Ms. Schexnayder was questioned by defense counsel at the end of the trial. She denied being told how to testify and essentially denied saying what the investigator claimed to have heard her and the prosecutors saying. The trial judge heard what Ms. Schexnayder had to say, and he must have found her to be credible because he did not grant defendant any relief. Accordingly, this assignment of error is without merit.
For the reasons stated above, we affirm defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] Kendall Young was also charged with defendant in the same indictment and was tried separately from defendant in August 1996. The jury was unable to reach a verdict; and, on June 12, 1997, the State entered a nolle prosequi as to Young.
[2] We note that in accordance with an order from this court, the trial court issued a per curiam stating that the jury was sequestered.