I JOAN BERNARD ARMSTRONG, Chief Judge.
On June 9, 1994 the defendant, Walter Goodwin, Jr., was indicted for the first degree murder of Jonathan Craig Thompson. On February 9, 1995 a twelve-person jury found him guilty of second degree murder. The court denied his motion for new trial on July 11 and sentenced him to life imprisonment without benefits of parole, probation, or suspension of sentence. On appeal, this court affirmed his conviction and sentence, State v. Goodwin, 96-0334 (La.App. 4 Cir. 11/19/97), 703 So.2d 168, and the Supreme Court denied writs from this court’s ruling, State v. Goodwin, 97-3159 (La.4/28/98), 717 So.2d 1164.
The defendant then obtained documents pursuant to a public records request to the District Attorney’s Office. On April 23, 1999, the defendant filed an application for post conviction relief based upon the State’s failure to produce Brady material. The court denied the application on June 27, 2000, but apparently the court allowed the defendant to reopen the matter, and it set a hearing on the application for August 20, 2001. The court reset the matter a few times, with the court finally hearing the matter on December 20, 2001. The court took the matter under advisement, and it was not until April 11, 2003 that the court denied the application. The defendant’s writ application to this Court followed. FACTS
|;>The following fact summary is taken from this court’s opinion in the relator’s appeal:
At 1:24 a.m. on Monday, April 11, 1994, the New Orleans Police Department received a report that a gunman had just robbed Russell’s Marina Grill on Pontchartrain Boulevard. Two patrol officers arrived at the restaurant ten minutes later to find Elton Hall waving at them *1231 frantically from the parking area. Mr. Hall, a dishwasher at the Grill, told the police that after he had emptied some garbage cans in the back, he had reentered the restaurant to see five men, all dressed in black and wearing ski masks, holding guns on the night manager, Craig Thompson. He immediately ran away from the restaurant, returning only when he saw the five robbers leave. He had called Craig’s name several times with no response, and had then phoned the police.
One of the officers found Mr. Thompson in the restaurant’s upstairs office, dead from one gunshot in the back of his head. Two spent .40-caliber casings and two live rounds were found on the scene, and the lock on the upstairs safe had been shot. The policeman returned to his patrol car and called for EMS and the police homicide squad, then informed Mr. Hall that the manager was dead.
Mr. Hall now stated that he had seen only one gunman in the restaurant, standing near the cash register while Mr. Thompson was lying on the floor between two counters. The robber was described as about five feet, nine inches tall with African-American features visible through the holes in the ski mask. Mr. Hall denied hearing any gunshots, but said he thought he had heard the cash register click open as he ran out of the restaurant. He had watched from a distance for a few minutes, then saw the robber run from the back door and meet up with four others dressed all in black. Mr. Hall said that after he saw the five men run towards Robert E. Lee Boulevard, he had returned to the Grill. On further questioning later that morning, Mr. Hall added that the perpetrator was about two-hundred pounds with a light or red complexion, but he gave no indication that he could identify the gunman.
Paul “Pavlos” Petrou, the owner of the restaurant, was called to the scene by the police. His examination revealed that five hundred dollars in small bills were missing from the cash register, but the safe upstairs had not been opened. When asked if Mr. Thompson had had any troubles with any of the employees, Mr. Petrou recounted that one of the | «dishwashers, Kenneth Williams, had been suspended in the preceding week because he got mad and refused to leave when told he was not scheduled to work that day. The officers sent to investigate this lead reported, however, that Mr. Williams had an alibi for the time of the robbery and did not match Elton Hall’s description of the gunman. Lacking further information, the investigation was now at a standstill.
On the next afternoon, however, Kenneth Williams recontacted the police and gave a statement implicating Walter Goodwin, Jr., who also worked at the Grill. This led to interviews with two other employees, Isaac Shelby and Charles Caldwell, who corroborated Mr. Williams’ claim that Mr. Goodwin had confessed to robbing and killing Mr. Thompson. Mr. Caldwell also said he had seen Walter Goodwin take Mr. Shelby’s .40-caliber pistol, the same type used to kill Mr. Thompson, the evening before the murder. After the defendant had been arrested, Elton Hall said he had recognized Mr. Goodwin as the gunman in the restaurant, but at the time he had been too afraid to tell the police. In pre-trial proceedings, Mr. Hall recanted, then reaffirmed, his identification of Mr. Goodwin as the murderer. At trial, Mr. Shelby testified that he had varied his preliminary testimony because he felt pressured by members of his family. Both Mr. Williams and Mr. *1232 Hall admitted at trial that they had lied in their initial statements to police, and Mr. Caldwell testified that until the police told him he was “facing ten to twenty” himself, he had denied any knowledge of the crime or of Mr. Goodwin’s confession. It was established at trial that all four of these witnesses had been friends for years, attending the same school and generally hanging out together. They also were acquainted with the defendant before he began working at the Grill, because Walter Goodwin and Isaac Shelby were first cousins, and Mr. Goodwin often visited their grandmother who lived downstairs from Isaac. Additionally, Elton Hall, Kenneth Williams, Isaac Shelby and Charles Caldwell all testified that they had gotten together the morning after the murder, but their testimony regarding whether the robbery had been discussed was inconsistent. Although the gun used in the murder was never found, a spent casing furnished by Mr. Shelby established that it was his pistol that had fired the casings found in the restaurant. Isaac Shelby testified that his three friends, as well as the defendant, knew he had that gun in his bedroom.
Lit was also established at trial that within a few days of the defendant’s arrest, cabdriver David Carpenter had informed the police that his company had received a call at 12:59 a.m. on April 11, asking for a cab at Mr. Goodwin’s address. At 1:00 a.m., Mr. Carpenter had picked up a young African-American man who came out from between that address and the house next door, then dropped him off at 1:10 a.m. at a strip shopping center at the intersection of Robert E. Lee and Pontchartrain Boulevards. The man paid Mr. Carpenter twenty-five dollars to return at 2:00 a.m. and pick him up at the same location, in front of the 24-hour grocery. When the cabdriver returned at 1:50 a.m., the same man was just hanging up a pay phone inside the grocery. The man then came outside, got into the cab, and was dropped off at Mr. Goodwin’s address ten minutes later.
At his initial police interview, Mr. Carpenter said that the TV news had shown the man that had been arrested for the crime, but that man did not look like his passenger, who was about five feet, seven or eight inches tall, approximately 150 pounds, with dark skin, short hair, and a thin moustache. The fare had worn a black T-shirt with writing on it and was carrying a plastic bag similar to those used by grocery stores, but smaller. When presented with both photographic and physical lineups, Mr. Carpenter eliminated Mr. Goodwin as a possible suspect, but he indicated uncertainty when shown photo arrays that included the four witnesses who had implicated the defendant.
Mr. Carpenter explained that he had been careful to closely examine his passenger, who sat next to him in the front seat, both because he. had previously been robbed four times and because the man named no specific destination, but asked only to be taken to the area of Robert E. Lee and Pontchartrain Boulevards. He also stated that he had known the victim, Craig Thompson, and was thus concerned that the perpetrator be caught. Mr. Carpenter testified at trial that the defendant had a much lighter complexion than the man he had transported in his cab the night of the murder.
Walter Goodwin, Jr. took the stand in his own defense, testifying that he arrived home about 9:30 Sunday night and only learned about the murder the next morning. His father, Walter Goodwin, Sr., corroborated this, stating that when *1233 he went to bed at 12:15 that Sunday night, Walter 1 fiwas in the kitchen. Both Byron and Carlyn Goodwin, the defendant’s brother and sister, testified that they saw their brother in bed at approximately 1:00 a.m., and Carlyn saw him again, still in bed, twenty or twenty-five minutes later when she went to sleep. Both siblings also said that they would have seen or heard anyone leaving the house, so they were certain that Walter was home and in bed at the time of this murder. On cross examination, and without objection from the defense, the prosecutor used grand jury transcripts to show that both Byron and Carlyn Goodwin had previously given testimony that was inconsistent in several details from their assertions at trial.
State v. Goodwin, 96-0334, pp. 1-5, 703 So.2d at 168-170.
The relator argues that the trial court erred by denying his application for post conviction relief because the State withheld statements from its witnesses and from another person which included exculpatory evidence that could have been used to impeach the State’s witnesses.
In State v. Crawford, 2002-2048, pp. 10-11 (La.App. 4 Cir. 2/12/03), 848 So.2d 615, 623-624 [1] this Court set forth the standard for determining the merits of a Brady claim:
To comport with the dictates of the due process clause of the Fourteenth Amendment, the State must disclose to the defense evidence that is favorable to the defense and is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Porter, 98-0279 (La. App. 4 Cir. 3/15/00), 756 So.2d 1156, writ denied, 2000-1135 (La.1/10/02), 790 So.2d 3. Included in this rule is evidence that impeaches the testimony of a witness whose credibility or reliability may determine guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). “[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment.” State v. Rosiere, 488 So.2d 965, 970 (La.1986). See also Porter, supra.
| (¡Materiality was defined in U.S. v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985): “The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” The same test is to be employed whether or not the defense makes a pretrial request for exculpatory evidence. Bagley; State v. Phillips, 92-1063 (La.App. 4 Cir.2/29/96), 670 So.2d 588.
In Kyles v. Whitley, 514 U.S. 419, 434-435, 115 S.Ct. 1555, 1565-1566, 131 L.Ed.2d 490 (1995), the Court discussed “materiality”:
Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant’s acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). ... Bagley’s touchstone of materiality is *1234 a “reasonable probability” of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A “reasonable probability” of a different result is accordingly shown when the Government’s evidentiary suppression “undermines confidence in the outcome of the trial.” Bagley, 473 U.S., at 678,105 S.Ct., at 3381.
The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
See also State v. Greco, 2003-0709 (La.App. 4 Cir. 12/17/03), 862 So.2d 1152. In | .¡.addition, the Louisiana Supreme Court recently held:
For purposes of the State’s due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence. State v. Kemp, 00-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); State v. Knapper, 579 So.2d 956, 959 (La.1991).
Nevertheless, it is important to note that Brady and its progeny do not establish a general rule of discoverability, and not every case in which it is discovered post-trial that favorable evidence was withheld by the State will result in a reversal of the conviction. A prosecutor does not breach any constitutional duty to disclose favorable evidence unless the “omission is of sufficient significance to result in the denial of the defendant’s right to a fair trial.” United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). For purposes of Brady’s due process rule, a reviewing court determining materiality must ascertain:
not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. [Emphasis supplied.]
Kyles v. Whitley, 514. U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). See also, State v. Strickland, 94-0025, p. 38 (La.11/1/96), 683 So.2d 218, 234. Thus, the reviewing court does not put the withheld evidence to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial. Instead, a Brady violation occurs when the “evi-dentiary suppression ‘undermines confidence in the outcome of the trial.’ “ Kyles, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. at 3381).
State v. Bright, 2002-2793, pp. 5-6 (La.5/25/04), 875 So.2d 37, 41-42.
*1235 Here, the relator cites to two statements he received long after trial which he 1 ^contends contained exculpatory evidence that, had he been privy to their contents, would have undermined confidence in the jury’s verdict. He first points to the second statement of Elton Hall, wherein Hall stated that he had heard that Isaac Shelby had purchased the gun used in the robbery/murder and had given it to the relator to “go hit a hustle, but he said ... he said, he didn’t know what hustle he was gonna hit, he had supposed [sic] to know what hustle he was gonna hit [sic] he gave him the gun.” The relator points out that this statement directly contradicted the testimony of the State’s witnesses that the relator took the gun without Shelby’s knowledge. He acknowledges that the defense was given Shelby’s statement prior to trial wherein Shelby admitted he had obtained the gun at the relator’s request one and a half weeks prior to the murder and had given the gun to the relator on the evening before the murder when the relator told him he wanted the gun because he was going to ride around and find someone he could rob. He notes that this statement contradicts Shelby’s trial testimony, wherein Shelby admitted he obtained the gun for the relator but contended he did not know the relator had taken the gun until the next day, after the murder, when he noticed the gun was missing.
The relator argues that his theory of defense was that one of the young men in the group of workers from the restaurant, all of whom went to school together and associated with each other, was the actual killer, and the group conspired to blame the murder on him. He argues that while the members of the group first stated that Shelby had given the gun to the relator, by trial they were “in lockstep, all changing directions by a hundred and eighty degrees” in their testimony. This statement, however,' is somewhat-misleading. At trial, only two witnesses testified as to how the relator obtained the gun from Shelby. Shelby testified as described above, but the defense had his pretrial statement with which to impeach his testimony. Although for | asome unknown reason defense counsel did not question Shelby about his statement that he gave the gun to the relator, defense counsel elicited from Det. Graffeo that Shelby told him that “he [Shelby] gave him [the relator] the gun. I guess he informed him whére it was.” Charles Caldwell testified he saw the relator actually take the gun from under the upper bunk of the bed. This testimony matches his statement, which was not produced for the defense prior to trial. Elton Hall’s testimony did not include information ábout how the relator obtained the gun, most likely because this testimony would be inadmissible hearsay. The other members of the hypothetical conspiracy did not mention the source of the gun in either their statements or their trial testimony. Therefore, it appears that even if the defense had been given both Caldwell’s and Hall’s statements, these statements did not contain information which would have undermined confidence in the jury’s verdict. The jurors heard Shelby testify that he obtained the gun at the relator’s behest so that the relator could pull a “hustle,” a claim that Shelby made both in his statement and at trial. Thus, the issue of whether Shelby actually handed the relator the gun or merely showed the relator where he hid the gun does not appear to rise to the level of casting doubt on the validity of the jury’s verdict.
The relator further argues that the withholding of Hall’s statement was even more harmful when added to the information contained in a statement by Ryan Thompson, which was also not produced. Ryan Thompson, Hall’s cousin, accompanied Hall’s sister to the restaurant on the *1236 night of the murder to pick up Hall. Ryan Thompson, who apparently was not related to the victim and did not testify at trial, recounted in his statement that he arrived at the restaurant and was told by Hall that the restaurant had been robbed. Ryan Thompson stated that Hall described the robbery to him, telling Thompson he saw one man inside the restaurant robbing the Imvictim, and later saw five people running from the restaurant. Thompson stated that at Hall’s behest, he called Caldwell to attempt to get the telephone number of the owner of the restaurant, but Caldwell was unable to give him the number. He stated that he and Hall’s sister eventually left the scene. When asked if he had heard anyone talking about robbing the restaurant, Ryan Thompson stated that in early March Shelby told him that he knew a way to get a lot of money. When pressed, Shelby told Thompson that “he knew somebody that was gonna hit Russell’s Marina Grill. Isaac said that his cousin Walter had a plan to rob Russell [sic] Marina Grill and that he could do it.” Thompson denied that Shelby told him how he and the relator planned to execute the robbery, merely noting that they “had a plan.”
The relator now argues that had he been aware of Ryan Thompson’s statement, he could have subpoenaed him to show that Shelby, who owned the gun, had confided in Thompson that he planned to rob the restaurant. The relator acknowledges that Shelby’s supposed statement to Ryan Thompson also inculpated him in the robbery, but he likens his case to Kyles, where the informant tried to attribute many of his own actions to Kyles in the informant’s withheld statement. However, the withheld statements here do not rise to the level of exculpatory evidence found in Kyles, where the informant did not testify at trial but provided the basis for the investigating officers’ discovery of inculpa-tory evidence at the defendant’s house. Indeed, as noted above, the jury was aware that Shelby bought the gun purportedly used in the robbery and in some fashion gave it to the relator, who indicated he wanted to use it in a “hustle.”' In both Shelby’s statements and his trial testimony, as well as in Caldwell’s statement and testimony, they indicated that the relator confessed his guilt to them over the telephone. - In addition, although eyewitnesses identified Kyles as the shooter, none of them knew Kyles, and their lnwithheld statements cast doubt on their ability to identify him as the assailant. By contrast, here the sole eyewitness to the robbery/murder knew the relator.
The relator argues that although each of these withheld statements individually might not have cast doubt on the jury’s verdict, had the jury been aware of this mutual plan in addition to the fact that Shelby gave the gun to the relator, there is a reasonable probability that it would have reached a different verdict. However, it appears that these two withheld statements do not rise to the level of Kyles. The most Ryan Thompson’s statement would show was that both Shelby and the relator planned to rob the restaurant. The most Hall’s statement would show was that Shelby gave the relator the gun to use in the robbery, something Shelby admitted in his statement to the police, which was provided to the defense prior to trial. Neither of these statements exculpate the relator; both support the State’s theory that the relator planned to rob the restaurant and took the gun from Shelby (either with or without Shelby’s express knowledge). Neither statement furthers the defense theory that the group “set up” the relator as the robber/murderer.
As noted in Bright, “not every case in which it is discovered post-trial that favorable evidence was withheld by the State *1237 will result in a reversal of the conviction. A prosecutor does not breach any constitutional duty to disclose favorable evidence unless the ‘omission is of sufficient significance to result in the denial of the defendant’s right to a fair trial.’ ” Bright, 2002-2793 at p. 6, 875 So.2d at 42, quoting United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). Contrary to the relator’s claims, it appears that the information contained in the statements withheld in this case, even taken together, does not undermine confidence in the jury’s verdict. As such, the trial court did not err by denying the relator’s application for post conviction relief. For the foregoing reasons, Lathe relator’s application is granted and the judgment of the trial court affirmed.
WRIT GRANTED; RELIEF DENIED; JUDGMENT OF THE TRIAL COURT AFFIRMED.

. Writ den. 2003-1085 (La.3/12/04), 869 So.2d 815.