907 So.2d 168 (2005)
STATE of Louisiana
v.
Michael HAYWOOD.
No. 2004-KA-2097.
Court of Appeal of Louisiana, Fourth Circuit.
June 15, 2005.
Eddie J. Jordan, Jr., District Attorney of Orleans Parish, Donna R. Andriew, Assistant District Attorney of Orleans Parish, New Orleans, Louisiana, for Plaintiff/Appellee.
Pamela S. Moran, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
(Court composed of Judge JAMES F. McKAY III, Judge DENNIS R. BAGNERIS SR., Judge DAVID S. GORBATY).
*169 JAMES F. MCKAY, III, Judge.

STATEMENT OF CASE
The appellant Michael Haywood was indicted on April 1, 2004, for the second degree murder of Elbert Hart. At his arraignment on April 6, 2004, he pled not guilty. On May 14, 2004, the court heard and denied his motions to suppress the evidence and identification. After trial held on June 24, 2004, a twelve-person jury found him guilty of the responsive verdict of manslaughter. On July 2, 2004, Mr. Haywood filed a motion for new trial and pled not guilty to the multiple bill filed by the State. The court heard the multiple bill on August 20, 2004, and adjudicated Mr. Haywood a second offender. The court also heard argument on the motion for new trial on that date and took the matter under advisement. On September 3, 2004, the court denied the motion for new trial. Mr. Haywood waived all delays, and the court sentenced him to serve twenty years at hard labor as a second offender. The court also granted Mr. Haywood's motion for appeal. The record was lodged in this court on December 7, 2004, and the appellant filed his brief on January 10, 2005. The State responded on February 9, 2005. In response to the appellant's pro se filing, this court sent him the record on February 14, 2005, granting him forty-five days in which to file his own brief. On April 5, 2005, this court again sent him the record and granted him a final thirty days to file a brief. To date, he has filed nothing.

FACTS
At approximately 2:45 p.m. on January 11, 2004, a 991 call was made to the police concerning a shooting in front of 14101 Curran Boulevard. Police officers responding to the call found the body of Elbert Hart, Jr. lying next to a truck in front of Building M in the apartment complex. Mr. Hart sustained a gunshot wound to his chest, and a .9 mm shell was found next to his body. An autopsy performed the next day revealed that Mr. Hart died of a single gunshot wound that entered his left chest, passed through his aorta and his right lung, and exited his side near the back. Because the skin around the wound was seared, the pathologist who performed the autopsy testified that the gun was almost touching Mr. Hart when it fired. The pathologist also testified that the autopsy showed no evidence of pills in Mr. Hart's stomach.
Detective Cathy Reinhardt testified that she investigated the shooting. She stated that a few days after the shooting she met with Randy Mutin, who was an eyewitness to the shooting. Based upon a tip from another source, she compiled a photographic lineup, which included the photo of the defendant Michael Haywood, and she showed the lineup to Mr. Mutin, who by that time was incarcerated in Jefferson Parish on unrelated charges. She testified that Mr. Mutin chose the defendant's photograph as depicting the person who shot Mr. Hart. After the identification, she obtained an arrest warrant for the defendant and a search warrant for his residence, which was in Building M of 14101 Curran, the building in front of which Hart was murdered. Detective Reinhardt testified that although another eyewitness to the shooting, Albert Antoine, called her a few times to set up a meeting, Mr. Antoine never showed up at the meetings, and consequently she never spoke with him. She testified that in February, 2004 she had Mr. Antoine arrested as a suspect in the shooting.
Randy Mutin testified that he was Mr. Hart's friend, had spent the day with Mr. Hart prior to the shooting, and was with Mr. Hart when he was murdered. Mr. Mutin testified that he and Mr. Hart had been together since that morning, driving *170 around in Mr. Mutin's truck. Mr. Mutin admitted that he and Mr. Hart were intending to buy cocaine for resale, and Mr. Hart had $1500 with him to make the purchase. Mr. Mutin testified that sometime around noon they met Mr. Antoine at a gas station at Chef Menteur Highway and Dale Street, and they agreed to give Mr. Antoine a ride uptown. He stated that once uptown Mr. Antoine left the truck briefly to meet with a man, and then he returned and got back in the truck. Mr. Mutin testified that Mr. Antoine then directed them to drive to the Curran Boulevard address.
Mr. Mutin stated that after he parked the truck next to an abandoned car near Building M, Mr. Antoine left the truck and walked into a breezeway between two buildings. Soon thereafter, Mr. Antoine returned, and Mr. Hart opened the truck door for Mr. Antoine. Suddenly, the defendant appeared with an automatic gun, which Mr. Mutin described as possibly a .9 mm, and asked Mr. Antoine for $150 that Mr. Antoine owed him. Mr. Antoine replied that he did not have the money, and the defendant then turned the gun on Mr. Hart, grabbed him, and pulled him from the truck. Mr. Mutin testified he saw the two men struggling for the gun as he exited the driver's side of the truck. He testified that he then saw the defendant shoot Mr. Hart. Mr. Mutin testified that he ducked down, and when he looked up again, the defendant was running away into the breezeway. Mr. Mutin testified that although he did not see the defendant going through Mr. Hart's pockets, he theorized the defendant must have done so because the police later informed Mr. Hart's family that the $1500 was gone.
Mr. Mutin testified that he called the police and Mr. Hart's family, and he waited on the scene until the police arrived. At that point, he went to Mr. Hart's house to pick up the victim's family, and then they returned to the scene. He did not, however, speak with Detective Reinhardt that night, but instead spoke with her two days later. At that time, he gave a statement. He testified that he had never seen the defendant prior to the shooting, but he positively identified the defendant from a photographic lineup Detective Reinhardt later showed him.
On cross-examination, Mr. Mutin admitted having prior convictions for possession of marijuana and crack cocaine, as well as a conviction for simple burglary. He testified that he believed Mr. Antoine was aware that Mr. Hart had $1500 in his possession, and he further testified that he believed that Mr. Antoine knew the defendant. Mr. Mutin admitted that he did not remember at the time of trial what either Mr. Antoine or the defendant were wearing on the day of the murder, nor did he remember if he gave a clothing description to Detective Reinhardt. However, he maintained that the defendant was the person who shot Mr. Hart.
The defense called to the stand Albert Antoine, who testified that he was also present when Mr. Hart was shot. However, he admitted that he was so "loaded" at the time of the shooting from having consumed marijuana, cocaine, and heroin earlier that day that he could not identify the shooter. He also insisted that he did not know the defendant. Mr. Antoine testified that Mr. Mutin and the victim picked him up at a gas station on Chef Menteur at around noon on the day of the shooting, and they gave him a ride to the Calliope Project uptown, where he left the truck and bought some heroin. Mr. Antoine testified that he reentered the truck and used the heroin. He then directed Mr. Mutin to drive him to the Curran apartments, where he normally bought marijuana twice *171 or three times a week, so that he could buy some marijuana.
Mr. Antoine testified that Mr. Mutin parked his truck near Building M, and he got out and walked into the breezeway looking for someone whom he indicated he did not find. He testified that he walked back to the truck and as he started to enter the truck, the gunman came up behind him with a gun. He testified that the gunman told him and the others in the truck to empty their pockets. He denied that the gunman asked him for $150 or that he told Mr. Hart to give the gunman $150. He also denied knowing that Mr. Hart had $1500 in his possession. He testified that the gunman told all three men to get out of the truck, and when Mr. Hart did so he began struggling with the gunman. The gun then fired, and Mr. Hart fell while the gunman fled.
Mr. Antoine testified that he and Mr. Mutin remained on the scene until the police arrived. He admitted he never spoke to the police about the shooting, but he indicated he did not do so for his self-preservation. He denied ever contacting the police to give a statement. He testified that he spoke with an assistant district attorney after his arrest, and he was offered immunity if he would testify against the defendant. He reiterated that he was so intoxicated at the time of the shooting that he could not identify the gunman.

DISCUSSION

ERRORS PATENT
A review of the record reveals there are no patent errors.

ASSIGNMENT OF ERROR
By his sole assignment of error, the appellant argues that the trial court erred by denying his motion for new trial. He alleges that the State withheld both the rap sheet of Mr. Mutin and taped statements by that witness which may have contained a discrepancy in his description of the shooter. He contends that he could have used both of these items to impeach Mr. Mutin, who was the only witness to identify him as the shooter.
He argues that the trial court should have granted his motion for new trial on two bases: (1) due to newly-discovered evidence, that being the rap sheet of Mr. Mutin and statements made by Mr. Mutin which might have contained impeachment evidence; and (2) in the interests of justice. In State v. Price, XXXX-XXXX, pp. 26-27 (La.App. 4 Cir. 4/02/03), 842 So.2d 491, 508-509, this court set forth the standard for reviewing a trial court's denial of a motion for new trial based upon a claim of newly-discovered evidence:
In order to obtain a new trial based on newly discovered evidence, a defendant must show: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not due to the defendant's lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature that it would probably have changed the verdict of guilty. La.C.Cr.P. art. 851(3); State v. Brisban, XXXX-XXXX, p. 12 (La.2/26/02), 809 So.2d 923, 931; State v. Bright, 98-0398, pp. 25-26 (La.4/11/00), 776 So.2d 1134, 1149. A trial court assessing the legal merits of a motion for new trial is given considerable latitude in evaluating the impact of newly discovered evidence on the verdict. State v. Brooks, 98-0693, p. 12 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 821. The trial court has much discretion in ruling on a motion for new trial. State v. Cureaux, 98-0097, p. 4 (La.App. 4 Cir. 5/26/99), 736 So.2d 318, 321. Review of the trial court's ruling is limited to determining whether the trial court abused its discretion. State v. Labran, 97-2614, p. 6 *172 (La.App. 4 Cir. 5/26/99), 737 So.2d 903, 907.
Although the appellant initially styles his withheld evidence claim as newly-discovered evidence, it is more properly a Brady claim. This court set forth the standard for determining the merits of a Brady claim in State v. Crawford, 2002-2048, pp. 10-11 (La.App. 4 Cir. 2/12/03), 848 So.2d 615, 623-624[1]:
To comport with the dictates of the due process clause of the Fourteenth Amendment, the State must disclose to the defense evidence that is favorable to the defense and is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Porter, 98-0279 (La. App. 4 Cir. 3/15/00), 756 So.2d 1156, writ denied, XXXX-XXXX (La.1/10/02), 790 So.2d 3. Included in this rule is evidence that impeaches the testimony of a witness whose credibility or reliability may determine guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment." State v. Rosiere, 488 So.2d 965, 970 (La.1986). See also Porter, supra.

Materiality was defined in U.S. v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985): "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." The same test is to be employed whether or not the defense makes a pretrial request for exculpatory evidence. Bagley; State v. Phillips, 92-1063 (La.App. 4 Cir.2/29/96), 670 So.2d 588.
In Kyles v. Whitley, 514 U.S. 419, 434-435, 115 S.Ct. 1555, 1565-1566, 131 L.Ed.2d 490 (1995), the Court discussed "materiality":
Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).... Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial." Bagley, 473 U.S., at 678, 105 S.Ct., at 3381.
The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been *173 enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
See also State v. Goodwin, XXXX-XXXX (La. App. 4 Cir. 8/18/04), 881 So.2d 1229; State v. Greco, XXXX-XXXX (La.App. 4 Cir. 12/17/03), 862 So.2d 1152[2]. In addition, the Louisiana Supreme Court addressed this issue:
For purposes of the State's due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence. State v. Kemp, 00-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); State v. Knapper, 579 So.2d 956, 959 (La. 1991).
Nevertheless, it is important to note that Brady and its progeny do not establish a general rule of discoverability, and not every case in which it is discovered post-trial that favorable evidence was withheld by the State will result in a reversal of the conviction. A prosecutor does not breach any constitutional duty to disclose favorable evidence unless the "omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). For purposes of Brady's due process rule, a reviewing court determining materiality must ascertain:
not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. [Emphasis supplied.]

Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). See also, State v. Strickland, 94-0025, p. 38 (La.11/1/96), 683 So.2d 218, 234. Thus, the reviewing court does not put the withheld evidence to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial. Instead, a Brady violation occurs when the "evidentiary suppression `undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. at 3381).

State v. Bright, 2002-2793, pp. 5-6 (La.5/25/04), 875 So.2d 37, 41-42. See also Goodwin.

The appellant argues that the two items listed above would have so impeached the credibility of Mr. Mutin, the only eyewitness who identified him as the shooter, that the jury would have had a reasonable doubt of the appellant's guilt. With respect to the rap sheet, at the hearing on the motion for new trial defense counsel stated that he did not learn of Mr. Mutin's burglary and drug convictions until the day before trial.[3] He also argued that he *174 was prohibited from questioning Mr. Mutin about these prior convictions because he did not have his rap sheet. In response, the Assistant District Attorney (A.D.A.) admitted that the State did not produce Mr. Mutin's rap sheet, but she stated that she mistakenly gave defense counsel two copies of Mr. Antoine's rap sheet instead of one copy of Mr. Antoine's and one copy of Mr. Mutin's. She stated that defense counsel never mentioned this error prior to trial. In addition, the A.D.A. pointed out that the jury was informed of Mr. Mutin's prior convictions at trial in any event. Indeed, at trial Mr. Mutin admitted he had prior convictions for simple burglary and for possession of cocaine and marijuana. In addition, the A.D.A. noted that her only objection to defense counsel's questioning concerning prior offenses was counsel's attempts to question Mr. Mutin about an armed robbery arrest for which he had not been convicted because evidence of arrests are not admissible for impeachment purposes.[4] She further noted that defense counsel elicited at trial Mr. Mutin's intent to buy drugs on the day of the shooting.
Although the appellant is correct that the State failed to produce Mr. Mutin's rap sheet, it appears that defense counsel took no further steps to get the rap sheet once he discovered that he had gotten two copies of Mr. Antoine's rap sheet by mistake. Moreover, the jury was made aware of Mr. Mutin's prior convictions during his cross-examination at trial. Tellingly, counsel did not argue at the new trial hearing that Mr. Mutin had other prior convictions, which were not made known to the jury. Thus, although the State should have produced the rap sheet, the failure to do so did not ultimately unduly impinge upon the appellant's ability to impeach Mr. Mutin with his prior convictions, and the trial court correctly denied the appellant's motion for new trial on this basis.
The appellant further argues that the State withheld evidence, which would have impeached Mr. Mutin's identification of him as the shooter, namely possible inconsistent descriptions given by Mr. Mutin in his statements to the police. At the new trial hearing, defense counsel argued that the statements included a description that was "supposed to be a different clothing description", but at the time of the hearing he had not yet been provided with the statement. In response, the A.D.A. stated that the taped statements had been in evidence and had been available for quite some time. When counsel stated that he believed that the State had to provide him with a copy of the statements, the trial court replied that the State only had to make the statements available, and counsel should have checked for them once the State had done so. Although defense counsel indicated he did not remember whether the State had provided answers to his discovery requests, the A.D.A. responded that both taped statements were mentioned in the supplemental police report, which was provided to defense counsel approximately one week after the appellant's arraignment. The A.D.A. further noted that the State had attached to its discovery response evidence cards showing where the tapes had been placed after being placed on the books and transferred to the property room, and the A.D.A. stated that this response was filed before any motion hearings were held.
The appellant now argues that he should have been provided with this possible discrepancy in the clothing description in order *175 to impeach Mr. Mutin's identification of him as the shooter. He argues that the State did not respond to his discovery request for the production of these statements. He bases this assertion on the fact that there is no State's response to discovery in the appellate record. However, as noted above, the A.D.A. testified that the State filed its discovery response prior to any motion hearing and included evidence cards for the statements showing where they could be located. Thus, it appears these statements were readily available to the defense prior to trial. Indeed, by the time of the new trial hearing, defense counsel still had not listened to the statements to determine if they did show any inconsistent clothing description. In addition, on appeal, the appellant does not argue that the statements actually contain inconsistent descriptions; he merely argues that they might contain them. As such, defense counsel did not show that the statements actually contained impeachment evidence, which would have probably impeached Mr. Mutin's credibility to the extent that the jury would have had a reasonable doubt about the appellant's guilt. Thus, the trial court did not err by denying his motion for new trial based upon newly-discovered evidence.
The appellant lastly argues that the trial court should have granted him a new trial as per La.C.Cr.P. art. 851(5), which provides for the granting of a new trial where "[t]he court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right." However, the Louisiana Supreme Court has held that such ruling presents nothing for review. In State v. Snyder, 98-1078, p. 38, fn. 22 (La.4/14/99), 750 So.2d 832, 860, the Court stated:
It is settled that a judgment on these grounds (invariably denying the motion) is unreviewable by an appellate court, which may review the grant or denial of a new trial only "for error of law." La. C.Cr.P. art. 858. See State v. Toomer, 395 So.2d 1320, 1328 (La.1981) (grant or denial of a new trial under Article 851(5) "presents nothing for this Court's appellate review"); State v. Williams, 343 So.2d 1026, 1037 (La.1977) (same), cert. denied, 434 U.S. 928, 98 S.Ct. 412, 54 L.Ed.2d 287 (1977); State v. Cortez, 503 So.2d 76, 78 (La.App. 5 Cir.1987) (same); State v. Savoie, 448 So.2d 129, 135 (La. App. 1 Cir.1984) (same), writ denied, 449 So.2d 1345 (La.1984).
Here, the trial court denied the appellant's motion for new trial on this basis as well, and the appellant's argument that the trial court erred by so ruling leaves this court for nothing to review.
In sum, this assignment of error has no merit.
Accordingly, we affirm the appellant's conviction and sentence.
AFFIRMED.
NOTES
[1] Writ den. XXXX-XXXX (La.3/12/04), 869 So.2d 815.
[2] Writ den. XXXX-XXXX (La.9/24/04), 882 So.2d 1164.
[3] Although defense counsel at one point referred to the conviction as an armed robbery conviction, he later noted it was a burglary conviction, and at trial Mr. Mutin admitted he had a simple burglary conviction.
[4] See La. C.E. art. 6091 B.